## STATE OF MARYLAND v. STEPHEN VERNON LEACH

[No. 103, September Term, 1982.]

*Decided August 17, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Jane E. Pilliod, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Gary S. Offutt, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court. MURPHY, C. J., dissents and filed a dissenting opinion at page 598 *infra.*

Appellant, Stephen Vernon Leach (Stephen), was convicted of possession of a controlled dangerous substance, phencyclidine (PCP), and of controlled paraphernalia in violation of Md. Code (1957, 1982 Repl. Vol.), Art. 27, § 287.[1] The Court of Special Appeals in an unreported opinion reversed and remanded for a new trial. That court held that the address given by Stephen to the police when he was being booked was, under the circumstances of this case, a statement made by the accused which should have been disclosed by the State pursuant to Md. Rule 741. The State petitioned for certiorari, and Stephen cross-petitioned challenging the sufficiency of the evidence. Both petitions were granted. We have concluded that the evidence was legally insufficient to convict, even if the statement made at

---

1. As relevant to this case, § 287 provides that it is unlawful for any person:

> (a) to possess ... any controlled dangerous substance ....
> ....
> (d) to possess ... controlled paraphernalia which shall mean ....
> ....
> (iii) ... mannitol ... or any other substance suitable as a diluent or adulterant in sufficient quantity and under such circumstances which reasonably indicate an intention to use any such substance for the illegal manufacture, distribution or dispensing of any controlled substance. Evidence of such circumstances shall include but not be limited to close proximity of any such controlled paraphernalia to any other adulterants, diluents or equipment commonly used in the illegal manufacture and distribution of controlled substances, such as but not limited to any of the following: scales, ... measuring spoons ... or any controlled substance.

booking was properly admitted. It is therefore unnecessary to express any opinion on the questions raised in the State's petition.

Stephen was tried jointly with his brother, Michael Lawrence Leach (Michael), at a bench trial. The essential question was whether Stephen constructively possessed the PCP and paraphernalia found in a one-bedroom apartment on the second floor of a rowhouse located at 3712 Erdman Avenue, Baltimore City (the Premises). We summarize the evidence most favorable to the State.

Prior to February 27, 1980, the date of their arrest, Stephen and his brother were objects of a police investigation that included surveillance of the Premises. On February 17 at 7:00 p.m., when Sergeant Kenneth Anderson (Anderson) began a surveillance, he saw Stephen's blue Datsun parked opposite the Premises. Within a half hour Stephen left. He returned five minutes later. Later both Stephen and Michael came out at different times. At 8:00 p.m. they went back into the house. Anderson left at approximately 8:30 p.m.

Anderson resumed a surveillance on February 19 between 8:00 p.m. and 9:45 p.m. Michael's red Barracuda was parked nearby. Stephen arrived shortly after 8:00 p.m. in the Datsun. After parking the car, Stephen went to the front door and let himself in with a key. At 9:15 p.m., both brothers came out and met another person who had arrived in a van, and who subsequently went into the house with them. Later, the three came outside. The brothers assisted the third person in trying to get the van running and presumably continued to do so until at least 9:45 p.m. when Anderson left.

On February 24 Detective Walter Roberts (Roberts) observed Stephen enter the Premises at 7:24 p.m. Roberts left after one hour. Stephen was still inside.

Relying principally on information from confidential informants who did not testify at trial, the police obtained a search warrant for the Premises, for Michael's car, and for

the persons of Michael and Stephen. On February 27, 1980, the police followed Michael from his place of employment to the Premises. After Michael had parked his car, and while he was approaching the front door, the police stopped him. Keys were removed from his pocket and were used by the police to gain entry for the search of the apartment.

The record contains a limited description of the floor plan of the apartment. In relation to the apartment's entrance, the living room is to the "left," the kitchen is to the "right," and the single bedroom is to the "left" of the kitchen in the rear of the floor. There was only one bed, described as "large" and located in the bedroom.

Found in the bedroom closet were a table scale, a pocket scale, a bottle of mannitol, three smoking pipes, and a green leather case holding drug cutting tools. On the dresser in the bedroom was a closed cannister which contained five individually wrapped packets of PCP having a street value of $700. A glass bottle, found in the bedroom, contained residue of a white powder that was analyzed as cocaine. Photographs seized from either the bedroom or living room included one depicting an unidentified individual standing in the living room of the apartment with Michael and Stephen in the background. Handwritten on the back of this photo were "John Potter holding greens" and "December 1979." Expert testimony was that "greens" are PCP adulterated flakes, usually parsley.

Personal papers found in the bedroom included two current bills, one for telephone service and one for gas and electricity. These bills were in Michael's name. The final items seized were a 30-X magnifier and a large table scale, both of which were found in plain view on a kitchen table. There was testimony that these items could be used in cutting and packaging drugs.

When the search was completed, Michael was arrested. Acting on a telephone call received at about the same time, the police proceeded to the 4000 block of Pourse Avenue, one and one-half miles away. There they arrested Stephen while he was walking a dog.

When the brothers were booked by the police, each gave 3712 Erdman Avenue as his address. At their appearance before a Commissioner, they apparently again gave the same address.[2] The Department of Motor Vehicles reflected Stephen's address, as of May 28, 1979, to be 3712 Erdman Avenue. Stephen's employer's records showed two addresses for him — 3712 Erdman Avenue and 4002 Pourse Avenue.

For the defense, Rita Cushner testified that Stephen was residing at 4002 Pourse Avenue where both she and her daughter, Stephen's friend, also lived. According to Cushner, Stephen had moved in a few weeks before Thanksgiving of 1979 and had stayed until late May of 1980. The dog with Stephen when he was arrested belonged to the witness' daughter. Neither brother testified.

During argument of counsel, the trial judge stated he was "not going to assume that two gentlemen their age who are brothers were sleeping in the same bed. That's an inference I'm not drawing . . . ." He found "[t]he evidence in this case [to be] abundantly clear that Michael Leach was the occupant, possessor of the apartment . . . ." As to Stephen the conclusion was that

> [b]ased on the evidence in the case, primarily the evidence of Mr. Stephen Leach's access to the apartment, the fact he had the key to the apartment, the fact he had at one point the motorcycle registered at the apartment, the fact that he gave this apartment as his address at the time of the arrest, I believe there is sufficient evidence to justify a . . . finding of guilty [of] . . . possession of Phencyclindine, and, in addition, I find that this evidence is buttressed by the . . . photograph in evidence bearing the date December, 1979 . . . .

"Possession" means "the exercise of actual or constructive dominion or control over a thing by one or more persons."

---

**2.** However, the District Court charging document dated March 26, 1980 lists Stephen's address as "4002 Corse Ave. [sic]."

Art. 27, § 277 (s). The statute recognizes, as we held in *Henson v. State,* 236 Md. 518, 525, 204 A.2d 516, 520 (1964), that possession may be constructive. Possession may also be joint. *See Garrison v. State,* 272 Md. 123, 128, 321 A.2d 767, 770 (1974); *Rucker v. State,* 196 Md. 334, 340, 76 A.2d 572, 574 (1950).

But the "evidence must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the prohibited . . . drug in the sense contemplated by the statute, *i.e.,* that [the accused] exercised some restraining or directing influence over it." *Garrison, supra,* 272 Md. at 142, 321 A.2d at 777.

Here the fact finding that Michael was the occupant of the Premises precludes inferring that Stephen had joint dominion and control with Michael over the entire apartment and over everything contained anywhere in it. Even though Stephen had ready access to the apartment, it cannot be reasonably inferred that he exercised restraining or directing influence over PCP in a closed container on the bedroom dresser or over paraphernalia in the bedroom closet. If one assumes that the scales and magnifier found in plain view in the kitchen at the time of the search were always kept there, still those items are intrinsically innocuous. They become significant by association with drugs or cutting agents.

The photograph adds little, if anything, to the State's case. It reflects possession of a controlled dangerous substance in December 1979 at the Premises by a third person. The flakes could have been brought there either by the third person or by the fourth person who took the photograph.

This case is not as strong for conviction as that of Shirley Garrison, where the proof was legally insufficient. In *Garrison,* the evidence was that

[o]n May 26, 1972, at 8:15 A. M., when Officer Cole, pursuant to the warrant for 1525 Leslie Street, forcibly entered the premises, an unidentified male and female — not charged — were sitting in the

living room; he and other officers proceeded directly to the second floor of the two-story house. Upon entering the rear bedroom Officer Cole observed Ernest Garrison ("Piggy") standing in an adjacent bathroom and saw him discard a plastic bag into the commode and flush it. Retrieving this jetsam he found it contained 173 glassine bags of heroin. Another officer, who proceeded to the front bedroom, found the appellant, nude, in bed, under the covers. Access to the bathroom was only through the rear bedroom.

No contraband was discovered in a search of the bedroom in which the appellant was found, but in the drawer of a combination dresser-wardrobe there was found $168 in currency, $85.18 rolled in coin wrappers, a rent card in the name of the appellant showing a tenancy beginning February 29, 1972 — with the rent paid through May 16th, and a "turn-off notice" addressed to "Miss Shirley Annette Garrison, 1525 Leslie Street" from the Baltimore Gas and Electric Company concerning an unpaid utility bill in the amount of $22.82. [272 Md. at 126-27, 321 A.2d at 769.]

Proving that Shirley Garrison lived in the same house with her husband did not prove that she possessed the 173 bags jointly with him. *A fortiori* the instant case fails where the trial court refused to accept that Stephen resided at the Premises, and where nothing else was admitted into evidence at trial that linked Stephen to the PCP or paraphernalia.

The trial court erred in denying Stephen's motion for judgments of acquittal.

> *Judgment of the Court of Special Appeals vacated.*
> *Case remanded to that Court with direction to remand to the Circuit Court for Baltimore City for the*

*entry of judgments of acquittal in
favor of Stephen Vernon Leach.
Costs to be paid by Mayor and City
Council of Baltimore.*

*Murphy, C. J., dissenting:*

As the majority opinion indicates, there was evidence at trial disclosing that Stephen Leach, together with his brother Michael, resided at the Erdman Avenue apartment at the time of the crime. Indeed, Stephen listed the apartment as his residence address with the Department of Motor Vehicles and with his employer. He was in possession of a key to the apartment which he was observed to use on several occasions at the time of the crime. When arrested, Stephen told the police that he resided at the Erdman Avenue apartment and he made a similar disclosure to the District Court Commissioner. There was evidence that shortly before the crime Stephen and his brother were photographed inside the apartment with a third party who was holding a cache of PCP adulterated flakes. To be sure, there was other evidence that the telephone and gas and electric bills were listed in Michael's name. And there was testimony from a friend of Stephen that, at the time of the crime, Stephen lived at an apartment approximately one and one-half miles from the Erdman Avenue apartment.

The incriminating evidence of illegal drug and narcotic paraphernalia involvement was found in the apartment's single bedroom and in the kitchen. The single bed in the bedroom was described as a large one. There was no evidence, one way or the other, as to whether Stephen or Michael slept in the bed. The trial judge declined to "assume" that the brothers were sleeping in the same bed. While he said that Michael was "the occupant, possessor of the apartment," he did not conclude, as the majority seems to indicate, that Stephen did not also reside at the premises. To the contrary, the trial judge, as trier of fact, found that

"[b]ased on the evidence in the case, primarily the evidence of Mr. Stephen Leach's access to the apart-

ment, the fact he had the key to the apartment, the fact he had at one point the motorcycle registered at the apartment, the fact that he gave this apartment as his address at the time of the arrest, I believe there is sufficient evidence to justify a . . . finding of guilty of . . . possession of Phencyclindine, and, in addition, I find that this evidence is buttressed by the . . . photograph in evidence bearing the date December, 1979 . . . ."

Notwithstanding this evidence, and the inferences reasonably to be drawn therefrom, the majority, in reversing, concludes as a matter of law that the evidence was legally insufficient to prove that Stephen exercised actual or constructive dominion or control over the illegal narcotics and narcotic paraphernalia in the sense that he exercised some restraining or directing influence over these items.

In so holding, the Court has lost sight of the first principle of appellate review of nonjury criminal cases. Maryland Rule 886 provides:

"When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

We have said time and again that in reviewing a criminal case that has been tried by the court, sitting without a jury, the question before us is not whether we might have reached a different conclusion from that of the trial court, but whether the trial court had before it sufficient evidence upon which it could fairly be convinced beyond a reasonable doubt of the defendant's guilt of the offense charged. Proof of guilt beyond all doubt has never been required; the difference in degree of proof is ordinarily for the trier of fact. *See, e.g., Tasco v. State,* 223 Md. 503, 165 A.2d 456 (1960); *Cooper v. State,* 220 Md. 183, 152 A.2d 120 (1959). In view of the facts,

as disclosed by the record, I think that the evidence that Stephen lived with his brother in an apartment saturated with illegal narcotics and narcotic paraphernalia was legally sufficient, in the circumstances, to support the trial judge's conclusion that Stephen, as well as Michael, was guilty of the offenses charged.