796 A.2d 821

Kevin MOYE

v.

STATE of Maryland.

No. 91, Sept. Term, 2001.

Court of Appeals of Maryland.

April 16, 2002.

4

Nicole M. Zell, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Stevel L. Holcomb, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

**BATTAGLIA, J.**

In the present matter we are called upon to consider whether a person may be found guilty of possession of a controlled dangerous substance ("CDS") and / or possession of drug paraphernalia in violation of Maryland Code (1957, 1996 Repl.Vol.), Art. 27, §§ 287 and 287A by virtue of having been staying in a house and having been present in the dwelling's basement in which drugs were located inside drawers which were open or partially open. Petitioner, Kevin Moye, argues that the evidence was insufficient to sustain his convictions for possession of marijuana and cocaine and possession of drug paraphernalia. We agree and therefore shall reverse.

## I. Facts

In the early morning hours of March 6, 2000, Prince George's County Police received a call that a "cutting" [1] was in progress at 3414 Ricky Avenue in Temple Hills, Maryland. The home was leased by Yolanda and Joseph Bullock, a husband and wife, who rented out the basement to Greg Benson. All of the occupants of the Bullocks's residence were present in the home on March 6th, along with petitioner Kevin Moye, the brother of Yolanda Bullock, who may have been staying in the Bullocks's home.[2]

---

1. A "cutting" as referred to in the record in this case means a common law battery committed by striking another with a knife. *See Lamb v. State*, 93 Md.App. 422, 448, 613 A.2d 402, 414 (1992)(quoting R. PERKINS, CRIMINAL LAW, 153 154 (3d ed. 1982)) ("Force may be applied to the person of another in many ways, as by striking another with the fist or a stick or a stone, by kicking or tripping, lassoing with a rope, cutting with a knife, or shooting."); *see also Banks v. State*, 92 Md.App. 422, 427, 608 A.2d 1249, 1251 (1992) (police called "[t]o investigate a cutting" where defendant actually had stabbed her boyfriend to death).

2. There was little evidence to establish that Moye "lived" in the Bullock household. In Petitioner's brief, Moye uses the term "live" in framing the issue before the Court. Moye also argues, however, that if he was in fact residing in the Bullocks's home, "he lived upstairs with [them], not in the basement rented by Greg Benson." (Pet. at 17–18). Petitioner also noted that at trial the "[o]fficers did not testify as to any belongings, residency papers, or any other evidence which could estab-

When the police arrived at the home, Yolanda Bullock came out of the house to meet them and stated that someone had cut her foot. She was followed by her husband, Joseph Bullock, who was uninjured. Shortly thereafter, Greg Benson came out of the house with cuts on both of his legs and told the police that someone else remained in the home. The police set up a barricade around the home and contacted the Emergency Service Team, a specialty assault weapons team, for support.

The police observed a black male, later identified as Moye, the petitioner, on the first floor of the Bullocks's home moving from windows on the left side of the house to windows at the front of the house. The police used a public announcement system to ask Moye to come out of the house under threat of sending in a K–9 unit. Once the K–9 announcement was made, Officer William R. Silvers, Jr. observed Moye looking through one of the windows at the back of the house on the first floor and then through a window in the back of the basement area. Thereafter, Officer Silvers saw no further movement within the house. Several minutes elapsed before Moye exited the Bullocks's home from a door leading out of the basement area which had been rented to Benson. Moye proceeded to the top of the basement steps on the outside of the home, where the officers arrested him. Officer Robert Black transported Moye to the hospital following his arrest so that he could receive treatment for a cut on his finger.

Following Moye's arrest, Officer Silvers testified that he and Officer Walden went to the back of the house to "make sure there were no other victims, no other suspects or weapons in the house." The officers entered the Bullocks's home through the basement door which had been used by Moye to leave the home. The basement area, as described by Officer Silvers, consisted of a small hallway opening into a larger living area bounded on one side with a long counter area encasing a sink, kitchen cabinets, and drawers. Three of the

lish that Petitioner resided at the home." (Pet. at 18). The record is clear that Greg Benson was the sole lessee of the Bullocks's basement.

drawers were open or partially opened and contained several small baggies of marijuana, a small digital scale betraying white residue, and a dinner plate upon which rested a razor blade and white residue.

Officer Silvers noticed a missing ceiling panel above the counter area. When he stood on the counter top to look into the ceiling, he discovered a bag containing marijuana and crack cocaine. No other drugs or paraphernalia were found anywhere else in the house.

The Bullocks, Benson, and Moye were all indicted with charges of possession of cocaine with intent to distribute in violation of Maryland Code (1957, 1996 Rep. Vol., 2001 Supp.), Art. 27, Section 286(a)(1),[3] possession of cocaine in violation of Maryland Code (1957, 1996 Rep. Vol.), Art. 27, Section 287,[4] possession of marijuana with intent to distribute in violation of Maryland Code (1957, 1996 Repl.Vol., 2001 Supp.), Art. 27,

---

3. Section 286(a)(1) provides:

(a) Except as authorized by this subheading, it is unlawful for any person:

(1) To manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance;

Section 286 was amended by Chapters 64 and 500 of the 1999 Maryland Laws, effective October 1, 1999, however, these amendments did not alter the text germane to the case at bar.

4. Section 287 provides in pertinent part:

Except as authorized by this subheading, it is unlawful for any person:

(a) To possess or administer to another any controlled dangerous substance, unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner, while acting in the course of his professional practice.

\* \* \*

(e) Any person who violates this section shall, upon conviction, be deemed guilty of a misdemeanor and be sentenced to a term of imprisonment for not more than four (4) years, a fine of not more than twenty-five thousand dollars ($25,000), or both; provided, however, that any such person convicted of a violation of this section involving the use or possession of marihuana shall be punished by a period of imprisonment not to exceed one (1) year or by a fine not to exceed $1,000.00 or both.

Section 286(a)(1), possession of marijuana in violation of Maryland Code (1957, 1996 Repl.Vol.), Art. 27, Section 287, conspiracy to violate the controlled dangerous substances law of Maryland with regard to the cocaine, and possession of drug paraphernalia in violation of Maryland Code (1957, 1996 Repl. Vol.), Art. 27, Section 287A.[5]

---

**5.** Section 287A provides in relevant part:

(a) *Definition.*–As used in this section, the term "drug paraphernalia" means all equipment, products, and materials of any kind which are used, intended for use, or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled dangerous substance in violation of this subheading. It includes but is not limited to:

\* \* \*

(5) Scales and balances used, intended for use, or designed for use in weighing or measuring controlled dangerous substances; . . .

\* \* \*

(b) *Factors in determining whether object is drug paraphernalia.*–In determining whether an object is drug paraphernalia, a court or other authority should consider, in addition to all other logically relevant factors, the following:

(1) Statements by an owner or by anyone in control of the object concerning its use;

(2) Prior convictions, if any, of an owner, or of anyone in control of the object, under any State or federal law relating to any controlled dangerous substance;

(3) The proximity of the object, in time and space, to a direct violation of this section or to a controlled dangerous substance;

(4) The existence of any residue of controlled dangerous substances on the object;

(5) Direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons whom he knows, or should reasonably know, intend to use the object to facilitate a violation of this section; the innocence of an owner, or of anyone in control of the object, as to a direct violation of this section shall not prevent a finding that the object is intended for use, or designed for use as drug paraphernalia; . . .

\* \* \*

(c) *Use or possession with intent to use.*–It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled dangerous substance in violation of this subheading. Any person who violates this subsection is guilty of a misde-

On September 27, 2000, trial commenced against both Moye and co-defendant, Greg Benson.[6] The State conceded that at no time did the police find drugs on the person of Kevin Moye, nor had he been tested for drugs at the time of his arrest. The State presented evidence that the digital scale found in the basement area tested positive for cocaine residue, although no drug testing was conducted on the plate upon which white powder residue was found. The evidence established that there was 0.07 grams of marijuana contained in the small baggies found in the counter drawers and 60.22 grams of marijuana along with 29.82 grams of cocaine in the bag found in the ceiling panel of the basement.

Moye moved for judgment of acquittal[7] at the close of the State's case, arguing that the decision in *Taylor v. State*, 346 Md. 452, 697 A.2d 462 (1997), disposed of the issues in the case. Moye asserted that the State had failed to demonstrate that he had exercised dominion or control over the drugs found in the basement of the Bullocks's home and failed to show that he had known that the drugs existed. The trial court granted the motion for judgment of acquittal on the charge of conspiracy to distribute cocaine but denied the

---

meanor and upon conviction for a first offense may be fined not more than $500. . . .

6. The Bullocks reached agreements with the State regarding the disposition of the charges against them. Yolanda Bullock pled guilty to simple possession of marijuana. Joseph Bullock testified against Moye and Benson pursuant to a plea agreement whereby the State placed the case against him on the STET docket in exchange for his testimony against Moye and Benson.

7. Maryland Rule 4 324(a) sets forth the basic procedure for making a Motion for Judgment of Acquittal:

A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case.

motion as to all other charges. Neither Moye nor Benson called any witnesses, and at the close of the case Moye renewed his motion for judgment of acquittal as to all remaining counts. At that juncture, the trial judge granted the motion with regard to the charge for possession with intent to distribute cocaine. The case proceeded to the jury on the charges of possession of cocaine, possession of marijuana, possession with intent to distribute marijuana, and possession of drug paraphernalia.[8]

The jury returned its verdict on September 28, 2000, finding Moye guilty of possession of cocaine, possession of marijuana, and possession of drug paraphernalia, and not guilty of posses-

---

8. The trial court instructed the jury, in part, as follows:

In order for the State to prove each Defendant guilty of possession as charged the State must prove, one, that the Defendant knowingly possessed the substance. Knowingly possessed the substance.

Number two, that the Defendant knew the general character, or illicit nature, of the substance. That the Defendant knew the general character or illicit nature of the substance.

And the third and last element is that the substance was what it was alleged to be, cocaine or marijuana.

Now, what does possession mean?

Possession means having control over that substance, whether it is actual or indirect.

Another word for indirect is constructive.

The Defendant does not have to be the only person who is in possession of that particular substance. And this means to say that more than one person can be in possession of the same substance at the same time. We often times call this joint possession.

A person not in actual control, who knowingly has both the power and the intention to exercise control over a thing, either personally or through another person, has what we call indirect possession.

Now, in determining whether a Defendant has indirect possession, or, again, constructive possession, as I said earlier, of a substance, consider all of the surrounding circumstances. Those circumstances can include, but are not limited to, say, the distance between that Defendant and the substance, whether that Defendant had some ownership or possessory interest in the place where the substance was found, and any other indications that the Defendant was participating in other than mutual use and enjoyment of a substance.

During deliberations, the jury sent a note to the trial judge asking the court to "clarify indirect possession versus direct possession," and querying, "Is circumstantial evidence considered enough to determine possession?" In response, the trial judge reinstructed the jury on possession.

sion with the intent to distribute marijuana.[9] On October 23, 2000, the trial court sentenced Moye to four years imprisonment for possession of cocaine concurrent with one year for possession of marijuana, with all but two years suspended and credit for time served and fined him $100.00 for possession of drug paraphernalia.

On January 22, 2001, Moye filed a Motion for Modification and Reduction of Sentence pursuant to Maryland Rule 4–345, arguing *inter alia*, that "the controlled dangerous substances and paraphernalia recovered in this case were located in a residence where [Moye] had been present but was not a resident," and "[t]hat neither any controlled dangerous substance nor paraphernalia were recovered from [Moye's] person." The trial court denied the motion on July 2, 2001.

Petitioner appealed the final judgment to the Court of Special Appeals, which affirmed his conviction. *See Moye v. State,* 139 Md.App. 538, 541, 776 A.2d 120, 122 (2001). The Court of Special Appeals held that Moye's "residence at a house in which marijuana and cocaine were found in plain view, combined with his presence in the specific area the drugs were located, was sufficient evidence to support his conviction for possession of those drugs." *Id.* at 541, 776 A.2d at 122. In reaching its holding, the Court of Special Appeals emphasized that the facts of this case were distinguishable from *Taylor v. State, supra,* and the cases cited therein, because those cases involved situations where controlled dangerous substances were located in a closed container or outside of the plain view of the accused. *See Moye, Id.* at 547–48, 776 A.2d at 125–26.

Moye filed a Petition for Writ of Certiorari with this Court, which we granted, 366 Md. 274, 783 A.2d 653 (2001), to consider the following:

---

**9.** Co-defendant Greg Benson was found guilty of possession of cocaine, possession with intent to distribute cocaine, possession of marijuana, possession with intent to distribute marijuana, and possession of drug paraphernalia.

1. Where drugs and paraphernalia were found in open drawers in the basement of a private residence, and the record shows that Petitioner and the lessees of the house live upstairs and that the basement is rented to a fourth individual, is Petitioner's mere presence in the basement sufficient to sustain convictions for possession of CDS and possession of paraphernalia?

2. Did the instruction given fail to inform the jury that it could convict Petitioner of possession of CDS and possession of paraphernalia only if it found, beyond a reasonable doubt, that Petitioner did in fact exercise some dominion or control over the CDS and paraphernalia?

For the reasons set forth below, we reverse the Court of Special Appeals's decision and Moye's conviction on the basis of insufficiency of the evidence. Therefore, we need not and will not address petitioner's second question.

## II. Standard of Review

The standard of review for appellate review of evidentiary sufficiency is whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *See State v. Albrecht,* 336 Md. 475, 478–79, 649 A.2d 336, 337 (1994). We view the evidence in the light most favorable to the prosecution. *See id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) and *Branch v. State,* 305 Md. 177, 182–83, 502 A.2d 496, 498 (1986)). We give "due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675, 685 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) (quoting *Albrecht,* 336 Md. at 478, 649 A.2d at 337). Although our analysis does not involve a re-weighing of the evidence, we must determine whether the jury's verdict was supported by either direct or circumstantial evidence by which any rational trier of fact could find Moye guilty beyond a reasonable doubt of the

various possession charges. *See White v. State,* 363 Md. 150, 162, 767 A.2d 855, 862 (2001); *Garrison v. State,* 272 Md. 123, 128, 321 A.2d 767, 770 (1974).

 The State's case against Moye for possession of a controlled dangerous substance and possession of paraphernalia depended on circumstantial evidence of joint and constructive possession of the contraband. While a valid conviction may be based solely on circumstantial evidence, it cannot be sustained "on proof amounting only to strong suspicion or mere probability." *White,* 363 Md. at 163, 767 A.2d at 862 (explaining that "[c]ircumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient")(quoting *Taylor,* 346 Md. at 458, 697 A.2d at 465)(internal quotations omitted). A conviction based solely on circumstantial evidence should be sustained only where "the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." *Wilson v. State,* 319 Md. 530, 537, 573 A.2d 831, 834 (1990); *West v. State,* 312 Md. 197, 211–12, 539 A.2d 231, 238 (1988).

## III. Discussion

 Moye was convicted of possession of cocaine and marijuana in violation of Art. 27, Section 287, and possession of drug paraphernalia in violation of Art. 27, Section 287A. The Maryland Controlled Dangerous Substances Act, Maryland Code (1957, 1996 Repl.Vol.) Art. 27, §§ 276–304 defines possession as "the exercise of actual or constructive dominion or control over a thing by one or more persons." Md.Code, Art. 27, § 277(s). We have further defined "control" of CDS as exercising a "restraining or directing influence over" the item allegedly possessed. *See Garrison,* 272 Md. at 142, 321 A.2d at 777. For the State to prove that Moye had control over the drugs or paraphernalia, the "evidence must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the prohibited ... drug in the sense contemplated by the statute, *i.e.,* that [the accused] exercised some restraining or direct influence over it." *See McDonald,* 347 Md. at 474, 701 A.2d at 686 (quoting

*State v. Leach,* 296 Md. 591, 596, 463 A.2d 872, 874 (1983))(internal quotations omitted).

█ The State did not need to show that Moye exercised sole possession of the drugs and paraphernalia. Rather, a person may have actual or constructive possession of the CDS, and the possession may be either exclusive or joint in nature. *See Taylor,* 346 Md. at 458, 697 A.2d at 465; *see also Henderson v. State,* 13 Md.App. 384, 392, 283 A.2d 418, 422 (1971). Here, the State advanced the theory that Moye and co-defendant Benson had joint and constructive possession of the marijuana, cocaine, and paraphernalia found in the basement.

██ Knowledge is an essential element of crimes of possession of CDS under Section 287 or 287A. For, as we explained in *Dawkins v. State,* 313 Md. 638, 547 A.2d 1041 (1988):

an individual ordinarily would not be deemed to exercise "dominion or control" over an object about which he is unaware. Knowledge of the presence of an object is normally a prerequisite to exercising dominion and control.

*Id.* at 649, 547 A.2d at 1046 (explaining that although the Maryland statute is silent with regard to a knowledge or *scienter* requirement, the statutory scheme as a whole "indicates an intention on the part of the General Assembly to require *scienter* as an element of the § 287 offenses"). Therefore, in order to be found guilty of a violation of § 287 or § 287A, the accused "must know of both the presence and the general character or illicit nature of the substance ... such knowledge may be proven by circumstantial evidence and by inferences drawn therefrom." *Id.* at 651, 547 A.2d at 1047. Thus, we must determine whether the State established beyond a reasonable doubt that Moye exercised a knowing dominion or control over the drugs and paraphernalia for which he has been convicted of possessing.

We believe that our decisions in *Taylor v. State, supra, Garrison v. State, supra, McDonald v. State, supra,* and *White v. State, supra,* direct the resolution of the case. In

*Taylor,* police officers responded to a complaint about a possible controlled dangerous substances violation at a beach motel. 346 Md. at 454–55, 697 A.2d at 463. The occupants admitted the officers to the room and permitted the police to search their belongings. *Id.* at 455, 697 A.2d at 463–64. When the officers entered the room, Taylor was lying on the floor, either asleep or pretending to be asleep. *Id.* at 455, 697 A.2d at 464. One of the other occupants of the room, Chris Myers, took a baggie of marijuana out of his own carrying bag and informed the officers that it was his marijuana, as well as directing the officers to another of his bags which also contained a baggie of marijuana. *Id.* at 455–56, 697 A.2d at 464. Although the officer testified that he smelled a strong odor of marijuana in the room, he did not observe anyone smoking it, no marijuana was visible upon entry into the room, and the ashtrays were all clean. *Id.* at 456, 697 A.2d at 464.

We reversed Taylor's conviction for possession of marijuana and paraphernalia, some of the same charges facing Moye, stating:

> under the facts of this case, any finding that he was in possession of the marijuana could be based on no more than speculation or conjecture. The State conceded at trial that no marijuana or paraphernalia was found on [Taylor] or in his personal belongings, nor did the officers observe [Taylor] or any of the other occupants of the hotel room smoking marijuana. Viewing the evidence in the light most favorable to the State, [the officer's] testimony established only that Taylor was present in a room where marijuana had been smoked recently, that he was aware that it had been smoked, and that Taylor was in proximity to contraband that was concealed in a container belonging to another.
>
> The record is clear that [Taylor] was not in exclusive possession of the premises, and that the contraband was secreted in a hidden place not otherwise shown to be within [Taylor's] control. Accordingly, a rational inference cannot be drawn that he possessed the controlled dangerous substance.

*Id.* at 459, 697 A.2d at 465–66. We explained that "mere proximity to the drug, mere presence on the property where it is located, or mere association, without more, with the person who does control the drug or property on which it is found, is insufficient to support a finding of possession." *Id.* at 460, 697 A.2d at 466 (quoting *Murray v. United States,* 403 F.2d 694, 696 (9th Cir.1969)).

In our analysis in *Taylor,* we discussed *Garrison v. State, supra,* in which we also reversed a conviction for possession with intent to distribute heroin based on insufficient evidence to establish a *prima facie* case of possession of a controlled dangerous substance in violation of Maryland Code (1957, 1971 Repl.Vol.) Art. 27, Section 286(a)(1). *Id.* at 461–62, 697 A.2d at 466–67. With regard to whether Garrison knew the drugs were on the premises, we noted that the heroin was seized from a bathroom where Garrison's husband was attempting to dispose of the drugs, while Garrison was lying in bed in another room. *See, Garrison,* 272 Md. at 126, 321 A.2d at 769. Under such circumstances we concluded that, "[t]he seized heroin was not in the plain view of [Garrison], nor was there a juxtaposition between her (in the front bedroom) and the contraband being jettisoned by her husband in the bathroom." *Id.* at 131, 321 A.2d at 771. Although Garrison had a possessory interest in the house, she was not the sole occupant of the home at the time the drugs were found. *See id.* Therefore, we reasoned, "[t]he appellant and her husband may well have jointly participated in the distribution of heroin, but on this record there was no substantive evidence offered which showed directly or supported a rational inference that she had 'the exercise of (either) actual or constructive dominion or control'—solely or jointly with her husband—over the 173 glassine bags of heroin seized while being discarded by her spouse." *Id.* at 142, 321 A.2d at 777. In analyzing whether there had been "mutual use and enjoyment of the contraband," we noted that although Garrison had needle marks which were approximately two weeks old, there were no fresh marks upon her body or other evidence indicating recent use. *Id.* at 127, 321 A.2d at 769, 771.

Subsequent to our decision in *Taylor*, we had another occasion to determine whether the evidence was sufficient to establish a *prima facie* case of possession of CDS. In *McDonald v. State*, 347 Md. 452, 474, 701 A.2d 675, 685 (1997), McDonald was convicted of possession of marijuana with the intent to distribute and possession of marijuana. *Id.* at 474, 701 A.2d at 686. McDonald personally had signed for delivery of a United Parcel Service (UPS) package which contained eighteen pounds of marijuana. *Id.* When the police executed a search warrant for McDonald's home half an hour after the package was delivered, they found McDonald standing over the UPS package with the drugs exposed. *Id.* at 474–75, 701 A.2d at 686. In applying the reasoning of *Taylor* and *Dawkins*, we concluded that the evidence was sufficient to support McDonald's conviction. *Id.* at 475, 701 A.2d at 686.

In our most recent case analyzing the rudiments of possession we were called upon to determine whether the passenger in a car was in possession of CDS found in its trunk. *See White*, 363 Md. at 153, 767 A.2d at 857. During the search of the trunk, the police found a box full of pots and pans which had concealed within it a separate package of 194 grams of cocaine. *Id.* at 157, 767 A.2d at 859.

Similar to Moye's predicament, the State's case against White rested solely on *circumstantial* evidence that White had joint and constructive possession of the cocaine found in the co-defendant's trunk. *Id.* at 162, 767 A.2d at 862. Ultimately, we reversed White's conviction, finding that even if we assumed the evidence in the record was sufficient to establish beyond a reasonable doubt that White had knowledge that the drugs were in the trunk of the car, there was insufficient evidence to establish that he exercised dominion and control over them. *Id.* at 165, 767 A.2d at 863.

In applying the logic espoused in *Taylor* and its progeny to the facts of the case *sub judice*, we are left with nothing but speculation as to Moye's knowledge or exercise of dominion or control over the drugs and paraphernalia found in the Bullocks's basement. Similar to the defendant in *Taylor*,

Moye did not have any ownership or possessory right in the premises where the drugs and paraphernalia were found. Joseph Bullock testified at trial that he and his wife, Yolanda, leased their home and that the couple rented out the basement to Greg Benson, who had been residing there for several months prior to March 6, 2000. He further testified that at the time of the incident, Moye was "living" in the house with him and his wife.[10] No evidence was adduced at trial as to how long Moye had been staying at the Bullocks's home. On this record, therefore, we cannot conclude that Moye had any ownership or possessory right to or in the Bullocks's home.

There is also nothing in the record establishing Moye's proximity to the drugs during the time he was in the basement. The evidence failed to establish where Moye was located in the basement in relation to the substances in question and the duration of his sojourn. The trial testimony established that one of the officers observed Moye looking out of a window at the back of the basement shortly before he exited the house. The record does not indicate where the window at the back of the basement was in relation to the drugs and paraphernalia found in the counter drawers. The photographs entered in evidence at trial, however, show that the window above the counter area where the drugs were found was covered completely with cardboard, which would have made it impossible for the police to have observed Moye through that vantage point.

The State's argument and the Court of Special Appeals's analysis in its opinion below emphasized that the illicit substances attributable to Moye were located in the open in the

10. The only testimony at trial which suggested that Moye may have been residing with the Bullocks on March 6, 2000, came from the following direct examination of Joseph Bullock:

State's Attorney: And was Kevin in your home that night [March 6, 2000] at some time?
Bullock: Yes.
State's Attorney: He was living in the house with you and your wife?
Bullock: Yes.

basement area. In distinguishing our decision in *Taylor*, the Court of Special Appeals stated:

> In this case, unlike *Taylor* and the cases it relied on, both marijuana and cocaine were in the open and were not concealed. The marijuana was in an open drawer, as was the dinner plate with the white powdery residue, and a razor blade on top of the plate....Although [Moye did not live] in the basement where the drugs were located, there was free access between the upstairs and the basement. Moreover, the police observed [Moye] in the basement of the residence where the cocaine and marijuana were discovered. [Moye's] residence in the premises and his presence in the room where the plain view contraband was discovered allows a reasonable inference that [Moye] was aware of and possessed the illegal drugs.

139 Md.App. at 548–49, 776 A.2d at 126. The State and the Court of Special Appeals, however, have gauged the "openness" of the location of the drugs from the perspective of the individual searching for the drugs, rather than from the perspective of the accused whose knowledge and awareness of the drugs are at issue.

The photographs of the basement area show one small baggie of marijuana in the open drawer to the right of the sink. That drawer also contained a box of kitchen bags, photo negatives, and the instructions booklet for the sink's garbage disposal unit. Two other photographs depict two counter drawers to the left of the sink containing baggies of drugs, the plate upon which the razor blade rested, the digital scale, and additional odds and ends such as coupons, packing tape, and what appears to be a phone book. These photographs were taken by someone standing directly over the open drawers. In contrast, an additional photograph taken within a few feet from the counter area reflects only the plate in the left hand drawer, and a box of kitchen bags in the right drawer.

The State also failed to produce any evidence concerning Moye's presence in the basement in the vicinity of the drugs. Although Moye suffered a cut on his finger which required

hospital treatment, the police found no blood in the basement. In addition, the knife used in the cutting incident, to which the police had responded, was found upstairs in the main portion of the house, rather than in the basement. Because the record does not adequately disclose the duration of Moye's visit to the basement, it is impossible to tell if, during the time he traveled into the basement from the first floor of the home prior to exiting through the basement door, he had, in fact, stood over the drawers in the counter and had the "plain view" vantage point urged by the State.

Further, there were no facts established at trial as to whether Moye was present in the room with the drugs for any given amount of time other than to say that he left the Bullocks's home through the basement door. The State offered no evidence to suggest any relationship between Benson and Moye which would have established that Moye frequented the basement of the Bullocks's home or that he was aware of what items were stored in the drawers of the counter area. Thus, we are confronted with a situation where a person has been convicted of possessing controlled dangerous substances and yet we cannot gauge whether he even knew the contraband was in the basement and controlled or exercised dominion over the CDS.

We also conclude that based on the evidence in this record, no reasonable inference could be drawn that Moye was participating with others in the mutual enjoyment of the contraband. There is no evidence concerning whether Moye, Benson, or the Bullocks were observed using drugs on the night in question. Although the facts may lead a trier of fact to believe that *someone* may have been using marijuana in the Bullocks's home, the evidence fails to establish *who* may have been using it, and *when* such use may have taken place.[11]

---

11. For examples of cases where although the facts indicate that there may have been suspicious drug activity taking place, the evidence was nonetheless insufficient to sustain a conviction for possession of CDS, *see Collins v. State,* 322 Md. 675, 682–83, 589 A.2d 479, 482 (1991)(concluding that there was no probable cause to even arrest the defendant, let alone convict him of a possession of controlled dangerous sub-

The Court of Special Appeals relied on its decisions in *Davis v. State*, 9 Md.App. 48, 262 A.2d 578 (1970) and *Cook v. State*, 84 Md.App. 122, 578 A.2d 283 (1990), *cert. denied*, 321 Md. 502, 583 A.2d 276 (1991), in its determination that drugs found by the police in plain view combined with an accused's "presence" in the home or room in which it is found are sufficient to support a conviction for possession of controlled dangerous substances. The facts of *Davis* and *Cook* are distinguishable, however, from the facts and circumstances in the present case.

The Court of Special Appeals's decision in *Davis* came long before this Court discussed the *scienter* requirement for possession of CDS in *Dawkins v. State*, *supra*. Thus, the court's analysis relied solely on whether Davis exercised dominion or control over the CDS. Davis was charged with and convicted of having control of a prohibited narcotic drug pursuant to an earlier version of Maryland's Controlled Dangerous Substances Law. *See* Maryland Code (1957, 1967 Repl.Vol.) Art. 27, § 277 (making it unlawful for a person to "possess" or "have under his control" any prohibited narcotic drug); *see also Bryant v. State*, 229 Md. 531, 537, 185 A.2d 190, 193

---

stances offense where there was no evidence which linked the defendant to the car or the film canister found therein which contained cocaine); *State v. Leach*, 296 Md. 591, 596, 597, 463 A.2d 872, 874, 875 (1983)(finding that the trial court erred in denying the defendant's motion for judgment of acquittal on possession of controlled dangerous substance and paraphernalia offenses where although defendant had access to the apartment where the substance was found the Court reasoned that, "it cannot be reasonably inferred that he exercised restraining or directing influence over PCP in a closed container on the bedroom dresser or over paraphernalia in the bedroom closet").

In contrast, for situations where the evidence was sufficient to sustain convictions for possession of CDS, *see Birchead v. State*, 317 Md. 691, 709, 566 A.2d 488, 496–97 (1989)(evidence at trial showed that Birchead was located in the hotel room where drugs were found "several hours before and during the execution of the search" which yielded 1.7 grams of loose cocaine, a 25 gram baggy of cocaine and drug paraphernalia consisting of a metal smoking screen, a metal sifter with a screen, a butane hand torch and a box of razor blades which were found in plain view on top of the television set and around the hotel room, along with additional drugs and cutting agents found on the bathroom counter, and that Birchead admitted to using cocaine in the hotel room that morning).

(1962)(stating that "Section 277 makes the possession of narcotics and the control of narcotics two separate offenses"). At that time, the term "control" meant "to exercise restraining or directing influence over, *viz.,* to relate to authority over what is not in one's physical possession." *See Davis,* 9 Md.App. at 52, 262 A.2d at 581 (internal quotation marks omitted).

In *Davis,* an undercover officer went to Davis's apartment on February 28, 1968 and purchased $50.00 worth of marijuana from Davis's wife, Maxine Green. *Id.* at 50, 262 A.2d at 580. The officer did not enter the apartment to complete the transaction, and did not observe Davis at that time. *Id.* On March 23, 1968, the police obtained and executed a search warrant for Davis's apartment, and observed "in plain view on the living room coffee table two small pieces of hashish and a razor blade." *Id.* Davis had not been present in the apartment when the police commenced the search, but he arrived home prior to the police's discovery of a metal box found on top of the stereo which contained "marijuana pipes, a bottle cap, an eye-dropper, a needle, a piece of cotton still in the bottle cap, a small postal scale and an envelope containing marijuana." *Id.* at 50–51, 262 A.2d at 580. Davis was convicted of control of marijuana based on separate indictments for February 28, 1968 and March 23, 1968. *Id.* at 49–50, 262 A.2d at 579–80.

On this evidence, the Court of Special Appeals concluded that Davis's conviction for possession of marijuana based on the February 28, 1968 incident was clearly erroneous. *Id.* at 52, 262 A.2d at 581. The court reasoned that where an individual, like Davis, does not have exclusive possession of a home or apartment where narcotics are found, "it may not be inferred that he knew of the presence of the narcotics and had control of them, unless other incriminating circumstances are shown which tend to buttress such an inference." *Id.* at 53, 262 A.2d at 581. The court explained that the only evidence linking Davis to the transaction taking place on February 28, 1968 was that Davis "was a co-lessee of the premises, resided there at least two nights weekly, and had an intimate personal

relationship with the co-lessee Green." *Id.* at 55, 262 A.2d at 582.

The court affirmed Davis's conviction stemming from the March 23, 1968 search of his apartment based on the fact that Davis was a co-occupant of the apartment where drugs were found in plain view on the coffee table, that he entered the premises shortly after the police began executing a lawful search warrant and discovered the drugs, and that Davis's arms bore fresh needle marks which "permitted an inference that he knew of the presence of, and was directly connected with" the drugs and paraphernalia found on the premises. *Id.* at 55–56, 262 A.2d at 583. The court opined that the inference supported the conclusion that Davis "controlled" the drug, although "the State [was] not required to show that the accused's control of the narcotic drug was knowing and wilful." *Id.* at 52, 262 A.2d at 581. Thus, for the March 23, 1968 incident, the State established that Davis had a possessory interest in the premises where the drugs were found, that the drugs were located prominently on a coffee table, and that Davis bore physical markings indicative of his recent use and enjoyment of the drugs. *Id.* at 55–56, 262 A.2d at 583.

The *Davis* court's analysis of the March 23, 1968 evidence supporting conviction remains distinguishable from the present case, because in *Davis,* the evidence showed a clear connection between the contraband and the accused, while there is a lack of such a nexus in the present case. To the contrary, the circumstances surrounding Moye's convictions more closely resemble those that warranted reversal, based on the insufficiency of the evidence emanating from the February 28, 1968 incident.

We are equally unpersuaded by the application of the Court of Special Appeals's decision in *Cook* to the instant case. In *Cook,* the court concluded that there was sufficient evidence for the jury to convict Cook for possession with intent to distribute cocaine based on a theory of constructive possession. *Cook,* 84 Md.App. at 135, 578 A.2d at 289. Presumably the Court of Special Appeals relied on *Cook* because of the

24

fact that like Moye, neither Cook nor his co-defendant, William Darby, had a possessory interest in the home where the CDS were found. *Id.* at 133, 578 A.2d at 289. The facts presented in *Cook*, however, are distinguishable from those adduced in the instant case, because in *Cook*, the evidence introduced at trial showed that Cook and his co-appellant, William Darby, had knowledge of and exercised control over the CDS. *Id.* at 134, 578 A.2d at 289 ("one could not conclude, by any stretch of the imagination, that appellants were unaware of [the drugs'] presence.")

In sum, the circumstantial evidence presented by the State in this case fails to establish the requisite knowledge and exercise of dominion or control over the CDS and paraphernalia for which Moye was convicted under Sections 287 and 287A. Accordingly, Moye's convictions for possession of cocaine and possession of marijuana in violation of Maryland Code, Art. 27 § 287 and possession of drug paraphernalia in violation of § 287A are hereby reversed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.*