930 A.2d 1111

**Richard D. HANDY**

v.

**STATE of Maryland.**

No. 1072, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Aug. 31, 2007.

**540**

Bradford C. Peabody (Nancy Forster, Public Defender, on the brief), Baltimore, for appellant.

Carrie J. Williams (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Panel: HOLLANDER, DEBORAH S. EYLER, and WOODWARD, JJ.

HOLLANDER, J.

A jury in the Circuit Court for Wicomico County convicted Richard D. Handy, appellant, of numerous drug and weapons charges. His appeal presents two thorny issues. The first pertains to the sufficiency of the evidence with respect to convictions arising from appellant's presence in the home of another during a police raid. The second requires us to

determine whether the court was entitled to impose separate sentences for each gun "possessed" by the defendant in regard to a single drug trafficking conviction. In turn, we must ascertain, in a case of possession of a firearm in connection with a drug trafficking offense, whether the unit of prosecution is the gun or the drug trafficking offense.

In particular, Handy was convicted of possession of marijuana with intent to distribute, in violation of Md.Code (2002, 2005 Supp.), § 5–602 of the Criminal Law Article ("C.L.") (Count 2); possession of marijuana, in violation of C.L. § 5–601(c)(1) (Count 4); possession of "controlled paraphernalia," in violation of C.L. § 5–620 (Count 6); possession of drug paraphernalia, proscribed by C.L. § 5–619 (Counts 7 and 8); four counts of possession of a firearm "during and in relation to a drug trafficking crime" (Counts 9, 11, 12, 13), in violation of C.L. § 5–621(b)(1); possession of a regulated firearm by a person under 21 years of age (Counts 20, 22, 23, 24), in violation of Md.Code (2003, 2005 Supp.), § 5–133(d) of the Public Safety Article ("P.S."); and altering the serial number on a firearm (Count 26), in violation of P.S. § 5–142(a).[1] As to the four firearms that appellant was convicted of possessing in relation to the single drug trafficking offense, the court imposed four sentences, two of which were consecutive and two of which were concurrent to the drug trafficking crime.[2] In total, appellant was sentenced to twenty-five years' imprisonment, with all but fifteen years suspended.

On appeal, Handy presents two questions, which we quote:

---

1. Appellant was acquitted of possession of cocaine, possession of controlled paraphernalia (cocaine baggies); possession of a short-barrelled shotgun; possession of a shotgun by a person under 21 years of age; and four counts of "use" of a firearm during a drug trafficking crime. The State entered a *nolle prosequi* with respect to four other charges.

2. Specifically, the court sentenced appellant to a term of five years for Count 2, and consecutive terms of ten years, with all but five years suspended, for Counts 9 and 11. Appellant also received concurrent sentences of ten years, with all but five years suspended, for Counts 12 and 13. Count 4 merged with Count 2. As to Counts 6, 7, 8, 20, 22, 23, 24, and 26, the court applied the rule of lenity, and did not impose a sentence.

1. Was the evidence sufficient to sustain the convictions?

If a defendant is convicted of a single drug trafficking crime, and possession of several firearms during and in relation to drug trafficking, and if a single violation of Criminal Law Article § 5–621(b)(1) occurs, are multiple consecutive sentences for each firearm illegal?

For the reasons that follow, we shall reverse three of appellant's convictions and sentences under C.L. § 5–621 for possession of a firearm in relation to a drug trafficking crime (Counts 11, 12, 13), but affirm the remaining convictions and sentences.

## FACTUAL AND PROCEDURAL SUMMARY[3]

The incident occurred on February 7, 2005. Appellant, who was born on October 22, 1986, was eighteen years old at the time of the occurrence and at the trial, held in June 2005.

At approximately 8:30 p.m. on February 7, 2005, Salisbury City Police Detective Brian Tilghman, along with other members of the Wicomico County Narcotics Task Force (the "Task Force"), executed a search and seizure warrant at 115 Delaware Avenue in Salisbury. Because the officers had information that "there were numerous subjects inside the residence," they used a "break and go" entry method, by which they broke a window located about "six or seven feet" from the side door. Detective Tilghman explained that the distraction gave the officers "a little bit of time to get through the door and kind of have a little bit of the element of surprise." Tilghman was the third officer of the 12–person team to enter through the side door into a small hallway leading from the outer door to the kitchen. The first two officers "continued into the living room," which was adjacent to the kitchen.

---

3. Our summary is based on the evidence adduced at the trial in June of 2005. In his brief, appellant complains generally about all of the possessory charges. Given the many convictions and appellant's challenge to the sufficiency of all of them, a detailed factual summary is necessary.

Detective Tilghman estimated the kitchen to be "maybe a 15-foot room." Upon entering the kitchen, appellant was one of two subjects "running" through the kitchen, "directly at" Tilghman. Appellant took "four or five steps" across the length of the room. As he ran, "[h]e was in arms reach of at least four firearms which were clearly visible upon [Detective Tilghman's] entry to the residence." Two of the weapons were located on the kitchen table and the other two were located on a pair of stools "right beside the table," which were around three feet tall. Detective Tilghman testified:

Immediately upon entering the kitchen, it was—they were large, three of the weapons were large revolvers, kind of like you see back in the wild, wild west days.

There were two firearms, one large revolver and one small semiautomatic handgun on the kitchen table, and then two other large revolvers on top of two stools which were stacked up like a shelf in the kitchen.

Some of them—I would have been blind not to see them. It was that blatant.

After "a brief struggle," appellant was subdued and placed in flex-cuffs. According to Maryland State Trooper First Class Kenneth Moore, a member of the Task Force, Handy did not have any drugs, paraphernalia, weapons, or ammunition on his person, nor any significant amount of money.

Trooper Moore testified as an expert "in the valuation and identification of controlled dangerous substances" and "the common practices of users and dealers of controlled dangerous substances." He recalled that he and a fellow officer conducted a physical surveillance of the residence "for about an hour and 15 minutes" before the police made their entry. Moore was parked across the street from the house, and was "able to observe ... the front door as well as the side door." According to Moore, "the only person that came or went from that residence" was "a confidential informant" who had been sent by the police.

Before entering through the side door, Moore waited "out front until the residence was secured." At around 8:30 p.m., after Detective Tilghman's team made the initial entry, Troop-

er Moore entered the house and "could smell burnt marijuana." There were "eight persons total in the house." Moore did not know whether the police had announced their presence, because he "didn't make entry." But, he heard "people inside, a female saying, F, it's the police. So I am assuming somebody yelled something or at least they recognized them." He immediately observed that appellant and Gary Simpson, a juvenile, were being detained in the kitchen, and that a "number of persons in the living room area" were also in custody. Moore also observed four handguns in the kitchen—two weapons on the table and two resting on stools.

Trooper Moore summarized his observations of the crime scene, stating:

> As soon as you enter the kitchen area, you see a very small kitchen, kind of cluttersome, some small chairs just to the left as you enter the door, there is a kitchen table with a window and the blinds had fallen down on top of the table. Sitting on top of the table, you saw a revolver style handgun on the left-hand side of the table. On the right-hand side, there was a small semiautomatic style handgun.
>
> Immediately to the left of the table, there was—I'm not sure if there was a small table or two stools. I think it may have been two stools with a box or a board or something on top of it. On top of there were two additional revolvers.
>
> You could see that there is a small closet just to the right of the table. The two persons that had been detained are to the middle of the table, I guess, more or less in the floor just a matter of feet from the table.

* * *

> The kitchen wasn't that big. It may have been 10 feet. 12 feet at the most in length and then probably 8 feet, it may have been 8 by 10 total, the entire kitchen.

* * *

> In the closet, it was a partially open closet. Upon looking in that closet, there was a sawed-off shotgun . . . determined to be a 16 gauge.

\* \* \*

On top of the kitchen stove that was there, there was some U.S. currency there, two cell phones and several small bags with like letter symbols, yellow symbols on it that each contained what I believed to be marijuana. That package was taken and sent to the Maryland State Police lab for analysis.

There was also on the kitchen table a box with some dice it in [sic], some plastic bags, sandwich bags, a scale, a small digital scale. On that scale as well as a razor blade, you could see white trace amounts of a substance. To me through my initial observations, I believed it to be cocaine residue.

There was a small trash can sitting behind the kitchen table. The entire top of that was filled with partial plastic bags. What we run into in investigating drugs [sic] crimes, that persons often used [sic] the sandwich bags, reason why is it doesn't raise any eyebrows, but they take and pack the substance that they are selling via cocaine, marijuana, what have you, down to the corners of the bags, tie them and they cut it, and that's how they distribute whatever they are selling at the time.

\* \* \*

[T]hey take the stuff and open [the bag], and stuff it in it, and then whatever they are selling as a product, the packaging gets sent down to the corners of the bag, and then that way, it [sic] can seal it off and tie it easier, and what you have left is just a partial bag, the top half of the bag with both corners gone. There was several of those bags on the immediate top of the trash can in the kitchen.

At the scene, appellant gave Trooper Moore his date of birth. At the detention center, appellant again provided the same information.[4] At the scene, Moore asked Handy "if he

---

4. The defense objected to Trooper Moore's testimony about appellant's date of birth, stating that counsel "was not given any information that

wanted to speak . . . ," and appellant responded that "he didn't know shit and didn't have anything to say." [5]

Trooper Moore testified that "five plastic baggies" were seized from the stove. Based on laboratory analysis, the five plastic bags contained 6.3 grams of marijuana. The digital scale and razor blade recovered from the kitchen table both "contained trace amounts of cocaine." From the kitchen closet, the police recovered a Winchester .16 gauge shotgun, which was "loaded with single rounds." The two weapons retrieved from the stools included a Ruger Model .22 revolver and a Smith and Wesson .357 Magnum. According to Moore, the Ruger "was loaded with six live .22 caliber rounds in it," and the Smith and Wesson was "loaded with six rounds of live ammunition." The weapons seized from the kitchen table included a Ruger Super Blackhawk .44 Magnum revolver and a Berreta semiautomatic .22 caliber handgun. The Ruger Super Blackhawk "was loaded with six rounds of .44 Magnum ammo." Moore testified that it appeared that, through the use of a "metal object," someone "actually gouged the metal numerous times in an attempt to deface the serial number." The Berreta was loaded "with one in the chamber as well as five additional rounds and the magazine in the weapon." It, too, appeared to have been "scraped and scratched as if someone had attempted to remove off the serial number from the weapon." However, the police were able to discern the serial numbers on both the Ruger and the Berreta.[6]

In reviewing a sketch of the first floor of the house, which was "not to scale," Moore confirmed that it was "a fair representation of the layout of the home." According to

---

[appellant] had made this statement." Further, defense counsel argued that it was "a statement of an element of the crime." The State responded that age is "a routine booking question that is contained on the statement of charges." The court overruled the objection.

5. This testimony was elicited during cross-examination, without objection.

6. The weapons, which were admitted into evidence, were all "operational." As noted, appellant was acquitted of possession of the shotgun.

Moore, the living room was the "same width" as the kitchen
and "[m]aybe 14 feet or so long, 16 feet tops." Describing the
sketch of the premises, Moore stated: "It contains where the
table was placed inside of the kitchen, where that shelf, the
two stools are put together and acted as a shelf where the two
handguns were recovered from ... the kitchen. The closet,
where the stove and refrigerator or [sic] were positioned in
there...." [7]

The State also presented five photographs to the jury.
According to Moore, one photograph "depicts the top of the
trash bag ... found in the kitchen with all the plastic baggies,
partial baggies sitting on top of it." With respect to a third
photograph, Moore stated: "This is a picture of the top of the
stove as we found it that day to the right-hand corner, bottom
right corner of the stove, you see that's the marijuana, sus-
pected marijuana, that was located there."

Referring to the next photograph, Moore testified: "This is
a picture of the small stand or the two stools that were placed
together that were located to the left of the kitchen table in
which two of the revolvers were recovered from. This is as
they were found.... The stand is right there. That's the

---

**7.** According to the sketch, which was admitted into evidence, the stove
abutted the front wall of the kitchen, to the right of the entry-way to the
living room. The table was positioned length-wise along the left wall of
the kitchen. The stool shelf was situated on the rear wall, to the left of
the entrance from the hallway connecting the side door to the kitchen.
The sketch also showed that the closet was located on the front wall of
the kitchen, immediately to the left of the living room entrance.

Moore marked on the diagram the various locations of the marijuana,
paraphernalia, and weapons seized from the kitchen table, stove, the
two stools, and closet. Using a "# 1," he indicated that the scale and
razor blade were retrieved from the middle of the table. He also used a
"# 1" to mark the location of the marijuana on the right-hand side of
the stove. He marked the location of the Ruger .22 and Wesson .357
Magnum with a "# 3" and "# 5," respectively, on the left and right
sides of the stools. In addition, Trooper Moore indicated the location
of the Ruger .44 Magnum with a "# 4," which he represented was on
the side of the table closer to the hallway entrance. A "# 6" marked
the location of the Berreta .22 caliber on the other side of the table,
which was closer to the living room. Finally, he indicated with a "# 7"
the placement of the Winchester .16 gauge shotgun on the right-hand
side of the kitchen closet.

kitchen table [next to it], and that's the stand as soon as you come in [through the hallway entrance]." As to the final photograph, Trooper Moore said: "This is a picture of the kitchen table. It depicts the revolver on the left-hand side of the table. The semiautomatic, we actually unloaded to make it safe...."

The following testimony is pertinent with respect to the alleged drug operation:

[THE PROSECUTOR]: Trooper Moore, can you explain the significance of the packaging of the marijuana as it relates to personal consumption versus someone dealing drugs?

[TROOPER MOORE]: Combined with the scales, plastic baggies and stuff that were there, the marijuana was broken down into individual amounts as you have found it there. It wasn't any kind of bulk matter. It was sold in what is commonly sold as 10 or 20 dollar bags, depending on who the seller is.

They were readily accessible. It was pretty apparent that they were probably there for whoever the next customer may be to come up to purchase the marijuana.

[THE PROSECUTOR]: Can you explain or describe to the jury the significance of the scales and how that relates to your thought regarding personal consumption?

[TROOPER MOORE]: Normal persons that are going to use, be it smoke marijuana, ingest some type of cocaine or other substance, they normally don't weigh it ... Scales, what we find are permanently used to reweigh and help package additional quantities ...

[THE PROSECUTOR]: The packaging devices or the remainder of the bags that were located in the trash, explain the significance of those as it relates to the individual who would be using drugs versus an individual who would be selling them.

[TROOPER MOORE]: Persons that want to buy or use the drug, they normally buy it already packaged. It's already in that little knot I described earlier or that small

plastic bag. They normally don't have the need to break it down into small baggies and cut it up, and upon looking at those baggies, there were several baggies there. There were probably 20 to 30 baggies that were in that trash can that had been cut or been manufactured or changed to what I recognized to be consistent with a person involved in the drug trade or distribution of drugs.[8]

\* \* \*

[THE PROSECUTOR]: Can you explain to the jury whether individuals work together in a drug dealing business or is it solely a sole proprietorship?

[TROOPER MOORE]: No sir. Now days, [sic] everybody tries to find a partner, some kind of team player, if you will, to work with.

[THE PROSECUTOR]: Can you think of any legitimate reason why a user of controlled dangerous substances would have the remnants of those baggies that you saw at this residence?

[TROOPER MOORE]: No, sir.

According to Trooper Moore, "the majority of drug dealers" in the county "arm themselves for fear ... of other drug dealers" robbing them. The following exchange is noteworthy:

[THE PROSECUTOR]: What again, as an expert, *what is the significance of those firearms* coupled with the drugs and the circumstances within that house? [9]

---

8. We did not find any testimony with respect to the denomination of the currency found on the stove. The photograph depicts what looks to be a $1 bill and a $10 or $20 bill. As the testimony indicates, the amount was not significant enough to affect Moore's "analysis."

9. Defense counsel initially objected to Trooper Moore's opinion testimony on the subject of the guns. After some "additional voir dire questions," the court was convinced "that he is an expert with respect to the use of firearms in the use or sale of controlled dangerous substances."

[TROOPER MOORE]: *The persons in this house had either been robbed or were anticipating being robbed by someone.* There is no doubt in my mind that they had armed themselves just for that purpose. They were either attempting to or going to retaliate against somebody or something was out there that we didn't know about, about some of, be it turf war, drug war, something going on. I mean, *that's very unusual to find that amount of guns. They were open to everybody in the house. Anybody in the house could have been armed at any given second.*

*The people in the kitchen were just a matter of feet from all the guns.* The people in the living live [sic] room could get to them in five or six short steps. *Those guns were placed so that anybody in that residence could have access to them.*

\* \* \*

[THE PROSECUTOR]: Is there any significance regarding the location of the marijuana, its proximity to an entry or exit of a residence?

[TROOPER MOORE]: During the controlled purchases which we made that day, given the information we received leading up to that day, was that the side door, *the kitchen area is where the dealing went as well as where the guns were,* so it made common sense to us, perfect sense, that once we went in, that was there because *that's the sales room more or less. That's where they conduct their business.*

*That's where they are prepared to defend themselves or what have you with the guns,* and it is easy access for the drugs that they have there. They can come in here, they get it here, a short business, and they are gone.

[THE PROSECUTOR]: In your training and experience, if these firearms were being possessed for the protection of the property, just the residence, itself, is there any reason why those firearms would be loaded and left out in the fashion that they were?

[TROOPER MOORE]: No, sir.

[THE PROSECUTOR]: What does that indicate to you?

[TROOPER MOORE]: *That they were there primarily for the drug dealers for the dealing that was going on to protect their profit or to fend off or do what they had to do to help their drug business.*

[THE PROSECUTOR]: To your knowledge, was there anything within that residence that prohibited or prevented Mr. Handy from having access to those firearms?

[TROOPER MOORE]: As I said, *anybody in that living room, in that kitchen were just a few steps away from any of those guns.*

(Emphasis added.)

On cross-examination, Trooper Moore conceded that, prior to the night of the raid, the police "hadn't actually sat and conducted any kind of lengthy surveillance" of the house, although they had "heard information about it." He identified Latonya Smith as the tenant and sole adult who resided at the residence, along with her two small children, who were present during the raid.[10] Moore was not sure whether appellant lived at the house. A man referred to as "Mr. Brown" was also present. When Brown tried to run through the front door of the house as the police made their entry, Moore tackled him. Brown "had some drugs on him."

Defense counsel questioned Moore about some of the contraband admitted into evidence. With respect to the scale, Trooper Moore stated that it was a "[h]igh precision pocket balance," which could be used for purposes other than to weigh drugs. Moore confirmed that the marijuana seized by the police weighed "about six grams," and that each of the "little bags" weighed "about a gram," which "would represent 5, 10, to $20." The trace amounts of cocaine were too small for the police to weigh. Moore also acknowledged that the guns confiscated from the kitchen were "not illegal in and of

---

10. Other than Ms. Smith, all of the adults who were present gave addresses other than the address of the residence.

themselves." Although the police attempted to obtain finger-prints from the weapons, the lab technician found "[n]one of any evidentiary value."

On redirect, Trooper Moore clarified that although the weapons seized at the house were generally legal, it was illegal for a person under 21 years of age to possess them. He also explained that it is not uncommon for an individual participating in a drug operation not to have any currency. He stated: "Normally, one person will sell, distribute or carry, and another person will be the money man. That way if they get caught, they don't all get caught with one pile, and they lose all of it."

At the close of the State's case, the defense moved for judgment of acquittal. As to the marijuana, the defense argued:

> We move for judgment of acquittal because there has been no testimony that my client possessed the marijuana, that he knew the marijuana was on the table, that he exercised any dominion and control over the marijuana . . . It's not his house.

The defense made similar arguments with respect to possession of the sandwich baggies, scale, and razor blade.

The prosecutor responded:

> Your Honor, there are several factors in determining possession and certainly the knowledge element, unless there is an admission, you are never going to know exactly what a person is thinking, so you have to infer intent or the thought process through the totality of the circumstances. And given the location of the marijuana, given the location of other contraband which would support knowledge of all the contraband within the residence, certainly the contra-band located in the kitchen which is what we are talking about here, that would support his knowledge, and I believe that in the light most favorable to the State, there is ample evidence of joint constructive possession with the other occupants within the house.

The court denied the motion, based on "the proximity and the other surrounding circumstances. . . ." As to the drug trafficking charges, defense counsel then argued:

I move for judgment of acquittal each [sic] of those counts for the same reasons, and that is the State has failed to prove that there was a nexus between the guns on the tables and the opinion testimony by the officer that he thought a drug trafficking crime had occurred. That the State did not sufficiently prove that any drug trafficking crime occurred, except that there were drugs present where some firearms were present.

Further, there was no testimony that these were regulated firearms which I think is a necessary element. And there has been no argument, or there has been no testimony, I would submit, that my client possessed or used those drugs [11] in relation to any drug—or participated in any drug trafficking crime.

The State responded: "Your Honor, it's a matter of law. And included in the instruction submitted to the Court that the handgun is a regulated firearm. Handguns have been introduced into evidence." The court denied the motion, stating: "There is a sufficient nexus at this point that a rationale [sic] trier or fact could find the essential elements of those charges."

Regarding the charges of underage possession of a regulated firearm, counsel for the defense moved for judgment of acquittal "for the same reason," and further asserted that the State "failed to prove [appellant] is under the age of 21." Finally, the defense moved for judgment of acquittal as to the charge of altering a serial number on a firearm on the ground that the State had failed to prove that appellant possessed the firearm in question. The court reserved ruling on the underage possession charges and denied the motion with respect to

---

11. Although the transcript says "drugs," we believe defense counsel meant "guns." C.L. § 5–621 makes it a crime to "possess a firearm under sufficient circumstances to constitute a nexus to a drug trafficking crime."

the alteration of a serial number charge, noting that "if the jury can find possession . . . there is a presumption he is the one who obliterated it."

Thereafter, the defense called Handy as its only witness. Handy confirmed that he gave his birth date (October 22, 1986) to the police when they asked for it. Appellant testified that he lived with his mother at 648 West Main Street in Salisbury, and confirmed that he was in Salisbury on the night of February 7, 2005. He described the course of events as follows:

> I was coming from my house on February 7th, and my friend, Gary Simpson, was at the store, I was coming from down the street because I just got finished eating with my mom, and he asked me, did I want to go to 115 and deliver a video game? [12] And

I told him, yes.

> So he said we had to go to his house first. So we went to his house. I had to go get my jacket because it was cold outside.

> So then his mother told him to be back after he gets done delivering the game. So we go there. He delivers the game, and he was chit-chatting a little bit and just as we was about to leave, the police came in.

Handy claimed that he arrived at the house in question "[l]ike two to three minutes" before the police entered. According to Handy, he had never been at that house before, although he knew who lived there. He recalled that he was in the living room when the police arrived, while Gary was in the kitchen. When asked to describe what happened when the police entered, he responded: "They came in, and they came in with guns and stuff, and I didn't know what was going on. They said, get down on the ground, so that's what I did. Then the officer that was arresting me, he grabbed me up, threw me into the kitchen and then hit me in the face. Then he put me under arrest." Appellant had no guns, ammunition, drugs,

---

12. Appellant stated that he delivered "a basketball game."

or drug paraphernalia on his person. Indeed, he claimed that the first time he saw the guns was "when [he] went in there," and he denied knowing that there were guns on the kitchen table or elsewhere. Handy also denied that the marijuana or any of the other contraband belonged to him. In particular, appellant denied any knowledge of the razor blade and the scale on the kitchen table, and claimed that he was not aware that "any of those guns or drugs or paraphernalia were in the kitchen." He responded in the negative when asked if he had "even gone in the kitchen before the police officers pushed [him] in the kitchen ..." Further, he stated that he did not smoke any marijuana while he was at the house, and that nobody had smoked it in his presence. When asked whether anybody tried to speak with him after his arrest, Handy said: "I'm not sure which one of the officers it was, but he asked me if we was to do a fingerprint on any of these guns, would my fingerprints be on them, and I told him no."

On cross-examination, appellant reiterated that Latonya Smith lived at the house. Appellant was not sure what time he arrived at the residence, but he had left his own house "around 7:30." From his house, Handy went to a store called "Sandi's One Stop," to "get something to drink," and unexpectedly encountered Gary. It took him "like a minute, minute or two" to get to the store, and he was at the store "[f]or a minute" before he left with Gary to go to Gary's house. According to appellant, it took the pair "[a]bout five minutes" to get to Gary's, and they only stayed at Gary's house for "one to two minutes."

Appellant recalled that he entered Smith's house through the front door, and there were "just a whole lot of people" at the house. He saw Ms. Smith, but he did not recognize any of the other people who were there. The following exchange is pertinent:

[PROSECUTOR]: When you—so it is your testimony this afternoon that you didn't run into the kitchen?

[APPELLANT]: No, sir.

[PROSECUTOR]: So Detective Tilghman who testified this morning, he's lying? [13]

[APPELLANT]: I didn't run at him when the police came in. They came in there. They was like, get down on the ground. I didn't do nothing but get on the ground. I never ran at them.

[PROSECUTOR]: So Detective Tilghman is lying?

[APPELLANT]: Yes, sir.

In rebuttal, the State recalled Trooper Moore. He stated that, during his surveillance of the residence, he was positioned "[m]aybe 45 to 50 yards away" from the house, and "both doors" were visible. He was certain that nobody had entered the front door during his watch; the police informant had entered through the side door of the house. Moore testified:

> From my vantage points [sic] in watching it, you could see anybody that came up and down the street as well as passed by in front of the residence. The driveway leading up to the right side of the residence where the side door was, you could see portions of the front yard just to the opposite side of the front porch, the front porch, itself, the front door as well as the side door. You could see anybody that came in and out.
>
> I actually observed—there is [sic] cat or it turned out to be a cat, I thought it was some kind of rat, skunk. It was fairly close. Everything was visible. Lighting wasn't bad, wasn't an issue. You could have see [sic] anybody that came or went from that residence in and around that yard.

On cross-examination, Moore confirmed that "it was dark that night," but "[i]t was well lit enough" so that he was able to see the cat. He also confirmed that, at the time, he had been "trying to coordinate with [the other officers] the execution of the search warrant."

At the close of evidence, counsel for the defense renewed the motion for judgment of acquittal. The court again denied

---

**13.** Defense counsel's objection to the characterization was overruled.

the motion. As noted, appellant was convicted of numerous offenses.

The court held a sentencing hearing on July 1, 2005, at which the State argued, in part:

> Your Honor, I have had the occasion to run Mr. Handy's juvenile history ... these would be his first adult convictions. However, Mr. Handy does have two commitments on his record. He has an extremely lengthy history of contact with the juvenile justice system....

> \* \* \*

> And obviously the State doesn't need to belabor the point that guns and drugs are about as bad a combination as you can get in this county or any other place in this state.

> \* \* \*

> Mr. Handy is exposed under the firearm and drug trafficking crimes to five years without parole under four counts. And while the legislature has provided or has not excluded the possibility of running those times concurrent with one another, I don't know that that is necessarily the appropriate course. I do know that, however, whatever you sentence, the maximum on those counts would be 20 years. You have to impose the minimum mandatory of five and that five is without parole ...

Defense counsel provided the court with information as to the sentences imposed on four others charged in the incident. Only one received a sentence as large as six years.

The court observed that appellant's juvenile record was "horrendous, including 20 prior offenses in the juvenile system including six assaults, three thefts, one robbery, one unauthorized use of a motor vehicle, the others being disorderly conduct and malicious destruction, two commitments." Thereafter, the court imposed a total sentence of fifteen years.[14] We shall include additional facts in our discussion.

---

**14.** Specifically, the court said:

. **DISCUSSION**

**I.**

Appellant argues that the evidence presented at trial was insufficient to sustain his convictions, because it failed to show that he "exercised any dominion or control over the contraband." As Handy notes, of the eight adults found in the house at the time of the police raid, Ms. Smith was the only person who actually lived at the premises. He adds: "There was no evidence, whatsoever, that Appellant ever slept there or even spent more than 'about and hour' in that house," and "no evidence tied him to anything at all in the house. . . ." Handy continues:

> Assuming, *arguendo*, that Appellant was not asleep at that time, there was no evidence that Appellant was smoking marijuana, much less that he exercised dominion or control over, the baggies of marijuana, the firearms, or the paraphernalia. Mere presence when others are smoking marijuana, does not make a person guilty of possession.

Handy adds that no marijuana or contraband, including "paraphernalia, weapons, drugs, firearms, rolling papers, razor blades, ammunition, or any 'significant amount of money,' " were found on his person. Moreover, he notes that "[t]he police found no fingerprints 'of any evidentiary value' on any of the firearms," he "made no incriminating statements," and

---

Under count two the sentence is five years . . .
Count four merges into count two.
Under count nine, ten years, I'll suspend all but five years, make it consecutive to count two.
Under count eleven, ten years, I'll suspend all but five years, make that consecutive to count nine.
Under count twelve, ten years, suspend all but five years, make that concurrent to the sentences under nine and eleven.
Count thirteen, ten years, suspend all but five years concurrent to the sentences under counts nine and eleven.
Applying the rule of lenity, although I'm not required to do this, there will be no sentence under counts 20, 22, 23 and 24 which are possession of a firearm under the age of 21.
There's no sentence under count six, seven, eight or 26.

"the police never even suggested that he appeared to be under the influence of marijuana." Appellant elaborates:

> It is not enough, that an individual was in close proximity to contraband so that he *could have* exercised dominion or control over it. For example, a guest at a party where marijuana is being smoked by others is not guilty of possession of marijuana, if he is offered a puff but, not wishing to partake, declines the offer. Even though the guest was in close proximity to the contraband and knew of its presence, he is not guilty of possession, because he did not exercise any dominion or control over it. (Emphasis in brief.)

Analyzing the factors set forth in *Folk v. State,* 11 Md.App. 508, 518, 275 A.2d 184 (1971), discussed *infra,* the State maintains that "three of the four determining factors are present" in this case. First, the State points out that "Handy was in very close proximity to the contraband" when the police raided the residence. Moreover, it notes that the firearms were "in plain sight on the kitchen table" at the time of the arrest; the "digital scale, empty plastic sandwich bags, and a razor" were also visible; and the other contraband seized by the police was also easily accessible and in the "same 'very small' room as Handy." In the State's view, the fact that the guns, drugs, and paraphernalia were in "plain sight" supports the conclusion that appellant "had knowledge of the contraband."

In addition, the State argues that the circumstances of Handy's presence support "a reasonable inference that he was involved in the use of marijuana and the handguns." In this regard, it points out that "when the police entered the kitchen, Handy ran toward the entry team and attempted to get past them, presumably to leave through the door the team entered."

 The standard of review for the sufficiency of evidence is well settled. We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

*Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Moye v. State,* 369 Md. 2, 12, 796 A.2d 821 (2002); *White v. State,* 363 Md. 150, 162, 767 A.2d 855 (2001); *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994). But, "it is not the function of the appellate court to undertake a review of the record that would amount to a retrial of the case." *State v. Pagotto,* 361 Md. 528, 533, 762 A.2d 97 (2000). Nor is it the function of the appellate court to determine the credibility of witnesses or the weight of the evidence. *Jones v. State,* 343 Md. 448, 465, 682 A.2d 248 (1996); *McCoy v. State,* 118 Md.App. 535, 537, 703 A.2d 237 (1997), *cert. denied,* 349 Md. 235, 707 A.2d 1329 (1998).

Of import here, the same standard applies to all criminal cases, including those resting upon circumstantial evidence. *Jensen v. State,* 127 Md.App. 103, 117–120, 732 A.2d 319, *cert. denied,* 356 Md. 178, 738 A.2d 855 (1999). "[C]ircumstantial evidence alone is 'sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused.' " *Painter v. State,* 157 Md.App. 1, 11, 848 A.2d 692 (2004) (citation omitted). *Accord Hebron v. State,* 331 Md. 219, 226, 627 A.2d 1029 (1993); *Wilson v. State,* 319 Md. 530, 536–37, 573 A.2d 831 (1990); *Hall v. State,* 119 Md.App. 377, 393, 705 A.2d 50 (1998). As the Court said in *Mangum v. State,* 342 Md. 392, 400, 676 A.2d 80 (1996), " '[c]ircumstantial evidence is as persuasive as direct evidence. With each, triers of fact must use their experience with people and events to weigh probabilities.' " (Citation omitted.) *See Hebron,* 331 Md. at 226, 627 A.2d 1029; *Wagner v. State,* 160 Md.App. 531, 560 n. 22, 864 A.2d 1037 (2005); *Allen v. State,* 158 Md.App. 194, 249, 857 A.2d 101 (2004), *aff'd,* 387 Md. 389, 875 A.2d 724 (2005); *Hagez v. State,* 110 Md.App. 194, 204, 676 A.2d 992 (1996). Conversely, "a conviction upon circumstantial evidence alone will not be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." *Hebron,* 331 Md. at 224, 627 A.2d 1029. *See Wilson,* 319 Md.

at 537, 573 A.2d 831; *West v. State*, 312 Md. 197, 211–12, 539 A.2d 231 (1988).

Appellant was found guilty, *inter alia*, of violating C.L. § 5–602 (Count 2), which makes it unlawful to "possess a controlled dangerous substance in sufficient quantity . . . to indicate . . . an intent to . . . distribute[.]" In addition, he was found guilty of four violations of C.L. § 5–621(b)(1), which proscribes the possession of "a firearm under sufficient circumstances to constitute a nexus to" a "drug trafficking crime" (Counts 9, 11, 12, and 13).

The State has the burden to prove that the accused had actual or constructive possession and control of the contraband. *See Taylor v. State*, 346 Md. 452, 458–59, 697 A.2d 462 (1997). "Possess" under § 5–101(u) of the Criminal Law Article "means to exercise actual or constructive dominion or control over a thing by one or more persons." " 'Control' of a controlled dangerous substance has been defined as the exercise of a 'restraining or directing influence over' the thing allegedly possessed." *Taylor*, 346 Md. at 457, 697 A.2d 462; *see McDonald v. State*, 347 Md. 452, 474, 701 A.2d 675 (1997).

Contraband need not be found on a defendant's person in order to establish possession. *State v. Suddith*, 379 Md. 425, 432, 842 A.2d 716 (2004). To prove possession of contraband, whether actual or constructive, joint or individual, the State must prove, beyond a reasonable doubt, that the accused knew "of both the presence and the general character or illicit nature of the substance." *Dawkins v. State*, 313 Md. 638, 651, 547 A.2d 1041 (1988). Thus, "[a]n individual's knowledge of the contraband is a key element in finding that individual guilty of possessing it . . ." *Suddith*, 379 Md. at 432, 842 A.2d 716. Indeed, knowledge of the presence of an object is generally a prerequisite to the exercise of dominion and control. *Dawkins*, 313 Md. at 649, 547 A.2d 1041. Knowledge "may be proven by circumstantial evidence and by inferences drawn therefrom." *Id.* at 651, 547 A.2d 1041. *See White*, 363 Md. at 161, 767 A.2d 855.

We turn to review the case law that is pertinent to our analysis.

In *Folk v. State, supra,* 11 Md.App. 508, 275 A.2d 184, the Court discussed constructive possession of contraband. We observed that four factors formed "[t]he common thread" of the cases sustaining convictions based on a theory of joint possession, *id.* at 518, 275 A.2d 184:

> 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

Although most of the cases applying the *Folk* factors concern constructive possession of illegal drugs and drug paraphernalia, this Court has employed the same analysis in cases involving constructive possession of other contraband. *See, e.g., McIntyre v. State,* 168 Md.App. 504, 521–22, 897 A.2d 296 (2006) (applying the factors to possession of child pornography); *Samuels v. State,* 54 Md.App. 486, 495, 459 A.2d 213 (1983) (applying the analysis to possession of stolen goods). In *McDonald v. State,* 141 Md.App. 371, 785 A.2d 836 (2001), we addressed the issue of constructive possession of a handgun. Quoting *Price v. State,* 111 Md.App. 487, 499, 681 A.2d 1206 (1996),[15] we recognized that " 'the proximity between the

---

**15.** *Price* involved a carjacking incident. Thus, we were "not concerned with the victim's dominion and control over the vehicle except insofar as such possession is interrupted by an act of intimidation or violence" on the part of the carjacker. 111 Md.App. at 499, 681 A.2d 1206. Citing *Folk,* the *Price* Court said, *id.* at 498–99, 681 A.2d 1206:

> In a possessory crime or one in which control or dominion over contraband or the instrumentality of the crime constitutes, or is an element of, the *actus reus,* the law engages in the legal fiction of constructive possession to impute inferentially criminal responsibility when the actor would be expected to disclaim ownership or control in order to avoid criminal responsibility. In permitting the inference of control or dominion over an instrumentality of crime, examples of

defendant and the contraband and the fact that the contra- band was within the view ... of the defendant'" were among the "several factors" relevant to the analysis. *McDonald,* 141 Md.App. at 380, 785 A.2d 836.

In *McDonald,* the weapon was found on the floor of the car in which the defendant was riding, and the defendant was "the only person in the back seat of the car." *Id.* He was also "the person closest to the weapon." *Id.* Moreover, the police officer saw the defendant "reaching down to place something on the floorboard," and observed "the butt of a handgun sticking out between appellant's feet." *Id.* We regarded the evidence as sufficient to support a finding that the defendant constructively possessed the handgun, and that he "put it on the floor in an attempt to hide it from the police." *Id.* at 380, 785 A.2d 836. *See also State v. Smith,* 374 Md. 527, 550, 823 A.2d 664 (2003)(holding the evidence was sufficient to support a finding that the lessee driver of a vehicle had knowingly transported a handgun recovered from the trunk of the vehicle in question).

*Cook v. State,* 84 Md.App. 122, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991), a case concerning the constructive possession of narcotics, is particularly analo- gous to the case *sub judice.* On appeal, Martin Cook and William Darby challenged the sufficiency of the evidence to support their convictions for possession of cocaine with intent to distribute and conspiracy to distribute cocaine. *Id.* at 126, 578 A.2d 283. Applying the *Folk* factors as to constructive possession, this Court said:

> Significantly, in the case *sub judice,* three of the above elements are present. When the police executed the raid, they found appellants *within several feet* of a table laden with cocaine and packaging paraphernalia. The cocaine and accompanying paraphernalia *were not secreted away, and*

---

factors that we have recognized to establish the nexus are the proximity between the defendant and the contraband and the fact that the contraband was within the view or otherwise within the knowledge of the defendant.

*one could not conclude, by any stretch of the imagination, that appellants were unaware of its presence.* The house was one from which the police had observed a man exit on several occasions to conduct drug transactions. The house was sparsely furnished and was without electricity. *This evidence, in the expert opinion of Officer Trogdon, indicated that the house was being used as a base for a drug operation in which the appellants played a role. Therefore, despite the lack of proof that appellants had a proprietary or possessory interest in the house, the evidence was sufficient to permit the jury to conclude that appellants exercised joint and constructive possession of the cocaine.*

*Id.* at 134–35, 578 A.2d 283 (emphasis added). *See also Suddith,* 379 Md. at 443, 842 A.2d 716 (finding the evidence sufficient to sustain the passenger's convictions for possession of drugs and drug paraphernalia found "strewn throughout" the inside of a stolen vehicle); *In re Ondrel M.,* 173 Md.App. 223, 236, 918 A.2d 543 (2007) (holding the evidence sufficient to support a finding that the juvenile, a front seat passenger of a vehicle occupied by four persons, was in possession of marijuana recovered from a crumpled piece of newspaper behind the driver's seat); *Larocca v. State,* 164 Md.App. 460, 482, 883 A.2d 986 (holding the evidence sufficient to support a finding that the defendant, a front seat passenger of a vehicle occupied by three individuals, was in constructive possession of marijuana found in white bag directly under the defendant's seat), *cert. denied,* 390 Md. 285, 888 A.2d 342 (2005); *Archie v. State,* 161 Md.App. 226, 247, 867 A.2d 1120 (holding the evidence was sufficient to support a finding that the defendant possessed contraband found in the kitchen of a residence where the defendant was found in the nearby bathroom attempting to dispose of contraband down the toilet), *cert. denied,* 387 Md. 462, 875 A.2d 767 (2005).

*Moye,* 369 Md. at 24, 796 A.2d 821, in which the Court concluded the evidence was insufficient to sustain the defendant's drug possession convictions, is noteworthy by way of comparison. The police in that case responded to a report that someone had been attacked with a knife. *Id.* at 5, 796

A.2d 821. Several people were in the residence when the officers arrived, including a couple who leased the house, a man who rented the basement, and the defendant. *Id.* According to the testimony, the defendant had been living with the couple, but it was unclear how long he had stayed there. *Id.* at 18, 796 A.2d 821. The couple and the basement tenant exited the residence shortly after the police arrived. *Id.* at 6, 796 A.2d 821. From the outside, the police observed the defendant moving around the first floor of the house. They later saw him looking out of a window in the basement. Shortly thereafter, the defendant was arrested as he exited from a door leading out of the basement. *Id.*

When the police entered the basement, they found three "open or partially opened drawers" that contained several small baggies of marijuana, a small digital scale with white residue, and a dinner plate with a razor blade and white residue on its surface. *Id.* at 7, 796 A.2d 821. No drugs or paraphernalia were found on the defendant's person, however. *Id.* at 9, 796 A.2d 821. In reversing Moye's drug convictions, the Court of Appeals said, *id.* at 17–18, 796 A.2d 821:

> [W]e are left with nothing but speculation as to Moye's knowledge or exercise of dominion or control over the drugs and paraphernalia found in the [couple's] basement. Similar to the defendant in *Taylor*, Moye did not have any ownership or possessory right in the premises where the drugs and paraphernalia were found ... No evidence was adduced at trial as to how long Moye had been staying at the [couple's] home. On this record, therefore, we cannot conclude that Moye had any ownership or possessory right to or in the [couple's] home.

As to the proximity factor, the Court said, *id.* at 18, 796 A.2d 821:

> There is also nothing in the record establishing Moye's proximity to the drugs during the time he was in the basement. The evidence failed to establish where Moye was located in the basement in relation to the substances in question and the duration of his sojourn. The trial testimo-

ny established that one of the officers observed Moye looking out of a window at the back of the basement shortly before he exited the house. The record does not indicate where the window at the back of the basement was in relation to the drugs and paraphernalia found in the counter drawers. The photographs entered in evidence at trial, however, show that the window above the counter area where the drugs were found was covered completely with cardboard, which would have made it impossible for the police to have observed Moye through that vantage point.

Moreover, the Court determined that it was "impossible" to discern whether, "during the time [the defendant] traveled into the basement from the first floor of the home prior to exiting through the basement door, he had, in fact, stood over the drawers in the counter and had the 'plain view' vantage point urged by the State." *Id.* at 20, 796 A.2d 821. The Court reasoned, *id.:*

> [T]here were no facts established at trial as to whether Moye was present in the room with the drugs for any given amount of time other than to say that he left [the couple's] home through the basement door. The State offered no evidence to suggest any relationship between [the basement tenant] and Moye which would have established that Moye frequented the basement ... or that he was aware of what items were stored in the drawers of the counter area. Thus, we are confronted with a situation where a person has been convicted of possessing controlled dangerous substances and yet we cannot gauge whether he even knew the contraband was in the basement and controlled or exercised dominion over the CDS.
>
> We also conclude that based on the evidence in this record, no reasonable inference could be drawn that Moye was participating with others in the mutual enjoyment of the contraband. There is no evidence concerning whether Moye [or the other occupants] were observed using drugs on the night in question. Although the facts may lead a trier of fact to believe that *someone* may have been using marijuana in the ... home, the evidence fails to establish

*who* may have been using it, and *when* such use may have taken place.

(Emphasis in original.) [16] *See also White,* 363 Md. at 166–67, 767 A.2d 855 (holding the evidence insufficient to support a finding that the defendant, a front seat passenger in a car owned by the driver, possessed cocaine recovered from inside a box of pots and pans in the trunk of the vehicle); *Taylor,* 346 Md. at 459, 697 A.2d 462 (finding the evidence insufficient to establish that the defendant, one of four occupants of a hotel room, constructively possessed marijuana concealed in a container belonging to another, although "marijuana had been smoked recently" in the room where the defendant was present); *Livingston v. State,* 317 Md. 408, 416, 564 A.2d 414 (1989)(holding that the arresting officer lacked probable cause to arrest defendant, a rear seat passenger of a car, for possession of marijuana based on the discovery of two marijuana seeds in the front of the vehicle); *State v. Leach,* 296 Md. 591, 596–97, 463 A.2d 872 (1983)(reversing the defendant's convictions for possession of PCP and paraphernalia recovered from a closed container and a bedroom closet, respectively, in an apartment the defendant shared with his brother, where the brother was found to be the "occupant" of the premises); *Garrison v. State,* 272 Md. 123, 142, 321 A.2d 767 (1974)(reversing the defendant's conviction for possession of heroin with intent to distribute where the defendant, who had a possessory interest in the premises, was found in a bedroom adjacent to the bathroom in which her husband was attempting to discard the contraband).[17]

---

**16.** The *Moye* Court also distinguished *Cook, supra,* from the circumstances of the case before it, noting that "in *Cook,* the evidence introduced at trial showed that Cook and his co-appellant ... had knowledge of and exercised control over the CDS." *Moye,* 369 Md. at 24, 796 A.2d 821.

**17.** In addition to cases such as *Livingston,* 317 Md. 408, 564 A.2d 414; *Leach,* 296 Md. 591, 463 A.2d 872; and *Garrison,* 272 Md. 123, 321 A.2d 767, appellant relies on several extrajurisdictional cases to support his claim that the evidence was insufficient to establish constructive possession of the contraband. In light of the wealth of Maryland case

We are satisfied that the evidence supported appellant's convictions for possession of contraband. We explain.

 ·The evidence supported a finding that appellant was in close proximity to the contraband. As we have seen, appellant was in the kitchen at the time of the trial, where the contraband was located. Detective Tilghman testified that the kitchen was small, with a length of only "about fifteen feet." When the police entered the home, appellant "was in arms reach of at least four firearms," as well as the drugs and paraphernalia. Similarly, Trooper Moore stated that the "kitchen wasn't that big," and estimated it was "12 feet at most in length" or perhaps "8 by 10 total." [18]

Trooper Moore also offered his expert opinion with respect to the significance of the firearms coupled with the drugs in the house. His testimony, discussed earlier, indicated that the individuals in the kitchen were engaged in a large-scale drug operation. He stated: "There is no doubt in my mind that they had armed themselves just for that purpose."

Although Trooper Moore could smell "burnt marijuana," under *Taylor*, 346 Md. at 459, 697 A.2d 462, that evidence did not establish that appellant had used the drug. But, the evidence showed the house was a base for a drug operation in which, in the light most favorable to the State, Handy "played a role." *See Cook*, 84 Md.App. at 134–35, 578 A.2d 283. Notably, Detective Tilgman stated that appellant ran "four or five steps" across the kitchen before he was subdued. In *Jason v. State*, 9 Md.App. 102, 262 A.2d 774, *cert. denied*, 258 Md. 728 (1970), the Court noted that one of the defendants "attempted to flee" from the police, and we held the evidence sufficient to support a finding of constructive possession of

---

law addressing the issue of constructive possession of contraband, we need not address the foreign cases cited by appellant.

**18.** Appellant seems to concede the proximity factor in his brief, stating: "It is not enough, that an individual was in close proximity to contraband so that he *could have* exercised dominion or control over it." (Emphasis in brief.)

narcotics and paraphernalia found in various places throughout the premises in question. *Id.* at 111, 262 A.2d 774.

To be sure, the evidence did not establish that appellant had a possessory interest in the premises; only Latonya Smith and her children resided there. Appellant's lack of a possessory interest is not dispositive, however. Under *Cook,* 84 Md.App. at 134–35, 578 A.2d 283, "despite the lack of proof that [appellant] had a proprietary or possessory interest in the house," the presence of the other three *Folk* elements permitted the jury to conclude that appellant exercised constructive possession of the contraband.

Appellant testified at trial that he was at the house only "two or three minutes" before the police raid. In his brief, he states: "There was no evidence, whatsoever, that Appellant ever slept [at the premises] or even spent more than 'about an hour' in that house." But, appellant was present with permission. Moreover, Trooper Moore testified that he conducted a physical surveillance of the residence "for about an hour and 15 minutes" before the police made their entry, and he did not see anyone enter the residence during that time. Thus, appellant's testimony that he was at the house only "two or three minutes" before the police raid was inconsistent with Moore's testimony that no one had entered the house through the front door during his watch of one hour and fifteen minutes. Because appellant was not seen entering the house, the jury could easily infer that appellant was present before the surveillance began, and thus was inside for the entire length of the surveillance.

In addition, the evidence supported a finding that the marijuana and guns were in appellant's "plain view," particularly given the length of time he was in the house. Detective Tilghman testified that, "immediately" upon entering the kitchen, he observed "two firearms, one large revolver and one small semiautomatic handgun on the kitchen table, and then two other large revolvers on top of two stools." He stated: "I would have been blind not to see them. It was that blatant." Trooper Moore's testimony was to the same effect. The

photographs of the table and the stools corroborated the officers' testimony. Clearly, appellant was present long enough, in a small house, to see the objects located in plain view in a public part of the house. And, as we have seen, appellant was found in the same room of the house where the contraband was found.

The testimony showed that the razor blade, scale, and empty sandwich bags were on the kitchen table, although neither the razor blade nor the scale is discernable in the photograph. The photograph depicts two commercial boxes, which presumably contained the sandwich bags. The table appears to be cluttered with several other items, including a waste paper basket, a radio, several drink containers, and a fallen blind. As to the kitchen stove, the baggies filled with marijuana are discernable in the right-hand corner. The jury could have concluded that these objects would have been visible to someone in the kitchen.

We acknowledge that this is a close case. But, it was for the jury to decide whose version of events to believe. Clearly, the jury did not credit Handy's explanation for his presence in the house, nor was it required to do so. *See Acquah v. State,* 113 Md.App. 29, 54, 686 A.2d 690 (1996) ("The jury is the trier of fact and is not obliged to believe the explanations or denials offered by the defendant.") Applying the cases discussed above, along with the standard of review, we cannot say that the jury's conclusion was unsupported by the evidence with respect to the possessory charges relating to the handguns, drugs, and paraphernalia

## II.

Appellant was convicted of four counts of violating C.L. § 5–621, possession of a firearm "during and in relation to a drug trafficking crime" (Counts 9, 11, 12, 13), for which he received four separate sentences. For Counts 9 and 11, he received sentences of ten years, with all but five years suspended. Count 9 was to run consecutive to Count 2 (the drug trafficking charge), and Count 11 was to run consecutive to Count 9.

For Counts 12 and 13, he received sentences of ten years, with all but 5 suspended, concurrent to Counts 9 and 11.

C.L. § 5–602, the underlying drug trafficking crime, criminalizes possession with intent to distribute. C.L. § 5–621 proscribes possession of "a firearm under sufficient circumstances to constitute a nexus to the drug trafficking crime[.]" C.L. § 5–621, captioned "Use of weapon as separate crime," provides, in part:

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Drug trafficking crime" means a felony or a conspiracy to commit a felony involving the possession, distribution, manufacture, or importation of a controlled dangerous substance under §§ 5–602 through 5–609 and 5–614 of this article.

\* \* \*

(b) *Prohibited.*—During and in relation to a drug trafficking crime, a person may not:

(1) possess a firearm under sufficient circumstances to constitute a nexus to the drug trafficking crime . . .

\* \* \*

(c) *Penalty.*—(1) In addition to the sentence provided for the drug trafficking crime, a person who violates subsection (b) of this section is guilty of a felony and on conviction is subject to:

(i) for a first violation, imprisonment for not less than 5 years and not exceeding 20 years . . .

Appellant challenges the imposition of "multiple consecutive sentences for each of four firearms that he was convicted of possessing, all consecutive to the sentence for the drug trafficking crime." He points out that, under C.L. § 5–602, he was convicted of "a single 'drug trafficking crime,' . . . *i.e.,* the felony of possession with intent to distribute marijuana," and "was also convicted" under C.L. § 5–621(b) of possession of a firearm " 'under sufficient circumstances to constitute a nexus

to the drug trafficking crime ...'" He asserts that § 5–621(c)(1), which prescribes the penalty for such convictions, "does not address the issue of multiple firearms possessed during and in relation to the very same drug trafficking crime."

Handy rejects any suggestion that the General Assembly intended to permit the kind of sentence imposed here with respect to possession of multiple firearms. Appellant submits that "the intent of the Maryland legislature is clear, only with respect to providing a consecutive sentence for a single firearm violation, under Criminal Law Article § 5–621, and not with respect to possession of multiple firearms." He explains:

> If the legislature meant to provide for a consecutive sentence for each firearm possessed, it could easily have said so. If maximum, consecutive sentences were permissible for each of the four firearms possessed, here, the maximum sentence, for "a first violation," § 5–621(c)(1)(i), would be 80 years imprisonment, consecutive to the maximum sentence of five years for possession with intent to distribute marijuana. *See* Criminal Law Article, §§ 5–602(2) and 5–607(a). In short, the Maryland legislature would have to have intended that a life sentence was permissible, for a "first" offense. The 18 year-old defendant, in this case, could be ordered to serve 85 years in prison, under that absurd theory.

Appellant does not argue that there was an insufficient nexus between the weapons and the drug trafficking crime. Such a claim would obviously lack merit. *Johnson v. State,* 154 Md.App. 286, 309, 839 A.2d 769 (2003), *cert. denied,* 380 Md. 618, 846 A.2d 402 (2004), we said: "It is now well settled that the trier of fact is entitled to find that when (1) drugs are discovered under circumstances that indicate the person possessing those drugs intended to distribute them, and (2) a gun is discovered in close proximity to the drugs, the gun was possessed 'in relation to' a drug trafficking crime." Rather, appellant asserts that the sentencing statute at issue here is ambiguous with respect to whether consecutive sentences may be imposed for the possession of multiple firearms during a

single "drug-trafficking crime." Therefore, he contends that "the rule of lenity applies."

Handy argues: "Where the statute is ambiguous and the legislative intent is not clear, the rule of lenity applies, and the defendant gets the benefit of the doubt." (Citations omitted.) In *Melgar v. State*, 355 Md. 339, 347, 734 A.2d 712 (1999), the Court explained: "[T]he rule of lenity instructs that a court 'not interpret a ... criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the Legislature] intended.'" *Id.* at 347, 734 A.2d 712 (citations omitted) (alterations in *Melgar*).

The State counters that appellant's constructive possession of "four distinct firearms" resulted in "four separate violations of § 5–621(b)," and thus the trial court "properly imposed a separate sentence for each violation." In its view, "The plain language and legislative history of § 5–621 ... support separate convictions and sentences for each firearm possessed in connection with a drug trafficking offense." The State posits:

> The Court of Appeals, in *Brown v. State*, 311 Md. 426, 434 [535 A.2d 485] (1988) defined "unit of prosecution" as "what the legislature intended to be the act or course of conduct prohibited by the statute for purposes of a single conviction and sentence." Here, the central question is whether the legislature intended the prohibited act to be the possession of a firearm (with nexus to drug trafficking), or the drug trafficking offense itself.

According to the State, "[w]hen interpreting other statutes proscribing the possession of firearm [sic], this Court has determined that the unit of prosecution is the gun." (Citations omitted.) Looking to the legislative history of Article 27, § 281A, a former codification of C.L. § 5–621, the State argues that C.L. § 5–621(b) "was enacted to reduce [the risk of drug-related homicide] by making the possession of *any* firearm during a drug trafficking offense a separate felony." (Emphasis in brief.)

Unpersuaded by appellant's "stacking" contention, even though it could result in the imposition of an eighty-year prison term for a first-time offense, the State argues:

> Many criminal statutes have maximum sentences that, if imposed consecutively in the appropriate circumstances, would render what Handy posits as "absurd" results. A "first offender" who burglarizes four houses on the same block in one night could also properly be sentenced to eighty years in prison pursuant to Criminal Law § 6–202.[19] It is left to the trial court's discretion whether such a sentence is appropriate.

 The Double Jeopardy Clause of the Fifth Amendment "prohibits cumulative punishment as well as successive prosecution." *Hubbard v. State*, 395 Md. 73, 88, 909 A.2d 270 (2006)(citing *Brown v. Ohio*, 432 U.S. 161, 165–66, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)). When a criminal defendant challenges "multiple indictments, multiple convictions, or multiple sentences, the unit of prosecution reflected in the statute controls whether multiple sentences ultimately may be imposed." *Moore v. State*, 163 Md.App. 305, 320, 878 A.2d 678 (2005); *see Brown v. State*, 311 Md. 426, 434, 535 A.2d 485 (1988) ("The unit of prosecution of a statutory offense is generally a question of what the legislature intended to be the act or course of conduct prohibited by the statute for purposes of a single conviction and sentence."). To ascertain the unit of prosecution, we must construe the statute. The principles of statutory construction guide our analysis.

 We apply the "normal rules of statutory construction in determining the legislative intent regarding the proper unit of prosecution and the appropriate unit of punishment in respect to violations of any criminal statute." *Melton v. State*,

---

**19.** C.L. § 6–202 provides, in part:
(a) *Prohibited.*—A person may not break and enter the dwelling of another with intent to commit theft or a crime of violence.
(b) *Penalty.*—A person who violates this section is guilty of the felony of burglary in the first degree and on conviction is subject to imprisonment not exceeding 20 years.

379 Md. 471, 478, 842 A.2d 743 (2004); *see Price v. State*, 378 Md. 378, 387, 835 A.2d 1221 (2003); *Liverpool v. Balt. Diamond Exchange, Inc.*, 369 Md. 304, 316, 799 A.2d 1264 (2002). In this endeavor, we are guided by the statutory text. *Huffman v. State*, 356 Md. 622, 627–28, 741 A.2d 1088 (1999); *State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339 (1996). We give the words of a statute their ordinary and usual meaning. *Ridge Heating, Air Conditioning & Plumbing, Inc. v. Brennen*, 366 Md. 336, 350, 783 A.2d 691 (2001); *Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128 (1998). If the statute is not ambiguous, we generally will not look beyond its language to determine legislative intent. *Chow v. State*, 393 Md. 431, 443, 903 A.2d 388 (2006); *Kaczorowski v. Mayor & City Council of Balt.*, 309 Md. 505, 515, 525 A.2d 628 (1987).

 When a term or provision is ambiguous, however, we consider the language "in light of the . . . objectives and purpose of the enactment." *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986); *see Deville*, 383 Md. at 223, 858 A.2d 484; *Maryland Div. of Labor & Indus. v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 425, 784 A.2d 534 (2001); *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 135, 747 A.2d 625 (2000). In this regard, "[w]e may . . . consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Balt., Inc. v. Dep't of Employment & Training*, 309 Md. 28, 40, 522 A.2d 382 (1987). If we cannot glean the Legislature's intent from "the statutory language alone, we may . . . look for evidence of intent from legislative history or other sources." *Allstate Ins. Co. v. Kim*, 376 Md. 276, 290, 829 A.2d 611 (2003); *see Motor Vehicle Admin. v. Lytle*, 374 Md. 37, 57, 821 A.2d 62 (2003).

 Moreover, the "rule of lenity," which is a principle of statutory construction, is pertinent. As noted, it "provides that doubt or ambiguity as to whether the legislature intended that there be multiple punishments for the same act or transaction ' "will be resolved against turning a single transaction into multiple offenses." ' " *White v. State*, 318 Md. 740,

744, 569 A.2d 1271 (1990) [20] (quoting *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) (quoting *Bell v. United States,* 349 U.S. 81, 84, 75 S.Ct. 620, 99 L.Ed. 905)(1955)); *see Spitzinger v. State,* 340 Md. 114, 124–25, 665 A.2d 685 (1995); *Gargliano v. State,* 334 Md. 428, 437, 639 A.2d 675 (1994); *Harris v. State,* 169 Md.App. 98, 104, 899 A.2d 934, *cert. denied,* 394 Md. 481, 906 A.2d 944 (2006); *Moore v. State,* 163 Md.App. 305, 320, 878 A.2d 678 (2005); *Bellamy v. State,* 119 Md.App. 296, 306, 705 A.2d 10, *cert. denied,* 349 Md. 494, 709 A.2d 139 (1998).

By way of analogy, we consider what the Court of Appeals has said with respect to Article 27, § 286, concerning enhanced penalties for subsequent offenders.[21] The Court recognized that it "is a highly penal statute that must be interpreted in light of the rule of lenity." *Deville v. State,* 383 Md. 217, 231, 858 A.2d 484 (2004). Moreover, "we construe any ambiguity of the subsequent offender statute in favor of the accused, and against the State." *Cantine v. State,* 160 Md.App. 391, 413, 864 A.2d 226 (2004), *cert. denied,* 386 Md. 181, 872 A.2d 46 (2005). And, "the State bears the burden of proving beyond a reasonable doubt all statutory prerequisites for the application of an enhanced sentence." *Id.* at 415, 864 A.2d 226; *see Jones v. State,* 324 Md. 32, 37, 595 A.2d 463 (1991).

In *Deville,* 383 Md. at 231–32, 858 A.2d 484, the Court declined to "read § 286(d) to include home detention within the definition of 'confinement . . . in a correctional institution'" and said: "Where the Legislature has not specifically instructed the courts of Maryland to expand the scope of a penal statute, the rule of lenity dictates that we limit such laws to that which can be construed clear from the statute." *See also Melgar,* 355 Md. at 342, 734 A.2d 712 (holding that the

---

20. *White* was superseded by statute on other grounds, as noted in *Fisher v. State,* 367 Md. 218, 242, 786 A.2d 706 (2001).

21. Effective October 1, 2002, Md.Code Ann., Art. 27, § 286(d) was recodified in §§ 5–608 and 5–609 of the Criminal Law Article of the Maryland Code.

time in pretrial detention "may not be included to satisfy the statutory requirement under § 286(d) of a term of confinement of at least 180 days.")

According to appellant, C.L. § 5–621 is "patterned after the federal statute, 18 U.S.C. § 924(c)(1)(A) [ (2000, 2004 Supp.) ], which provides that possession of a firearm in furtherance of a drug trafficking crime shall be punished 'in addition to the punishment provided for such ... drug trafficking crime.'" He maintains that "[t]he majority rule in the federal circuits holds that 'where a defendant has been convicted of a single drug trafficking offense and more than one firearm is involved, *a single violation* of § 924(c)(1) occurs and multiple consecutive sentences may not be stacked to account for each firearm seized.'" (Citation omitted)(emphasis in brief). Specifically, Handy claims that "at least six" federal circuits "adopt the rule that stacking is not permitted." On the other hand, he recognizes that the Fourth and Eighth Circuits "follow the minority rule," providing that " 'each separate use of a firearm in relation to a ... drug trafficking crime is punishable under section 924(c) regardless of whether other section 924(c) charges are related to the same predicate offense.'" (Citation omitted.)

■ The current codification of 18 U.S.C. § 924(c)(1) bears a very close resemblance to C.L. § 5–621. It provides, in part (emphasis added):

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, *during and in relation to any crime of violence or drug trafficking crime* (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, *or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—*

*(i) be sentenced to a term of imprisonment of not less than 5 years;*

Citing *Harris v. State,* 331 Md. 137, 156–57, 626 A.2d 946 (1993), the State argues that the Court of Appeals "has previously declined to follow the federal circuits' interpretation of § 924(c)(1) where Maryland law existed interpreting other statutes with identical language." The issue before the Court in *Harris,* 331 Md. at 141–42, 626 A.2d 946, was whether, in a prior codification of C.L. § 5–621, the Legislature contemplated the term "uses" to include situations in which a firearm "is neither actively employed nor brandished." Maryland Code (1957, 1992 Repl. Vol.).

Article 27, section 281A(b) provided that, " '[d]uring and in relation to any drug trafficking crime, a person who *uses,* wears, carries, or transports a firearm is guilty of a separate felony....' " *Id.* at 143 n. 3, 626 A.2d 946 (emphasis added). The Court of Appeals reversed the petitioner's conviction under the statute, holding that " 'use' requires that the defendant 'carry out a purpose or action' or 'make instrumental to an end or process' or 'apply to advantage' the firearm." *Id.* at 157, 626 A.2d 946 (citation omitted). Notably, the codification at issue in *Harris* did not contain a provision comparable to C.L. § 5–621(b)(1), which makes it a crime to *"possess* a firearm under sufficient circumstances to constitute a nexus to the drug trafficking crime." (Emphasis added.) *See Johnson,* 154 Md.App. at 306, 839 A.2d 769 (recognizing that, "[i]n 1996, in response to *Harris,* the General Assembly amended section 281A(b) by expanding the crime to include a person who 'possesses' a firearm in conjunction with a drug trafficking offense").

In its interpretation of Art. 27, § 281A(b), the *Harris* Court referred to case law construing former Article 27, § 36B(d), which proscribed " 'use of a handgun in the commission of a felony or crime of violence.' " *Id.,* 331 Md. at 148, 626 A.2d 946. The Court said:

In *Wynn v. State,* 313 Md. 533, 543 [546 A.2d 465] (1988), this Court defined "use" [under Article 27 § 36B(d) ] ... In

*Wynn*, the defendant was carrying a loaded .38 revolver during a housebreaking, a crime of violence ... Although the evidence did not establish that he actively employed or brandished the handgun while engaged in the housebreaking, he was charged with "using" the handgun during its commission.... We held that, by possessing the gun while committing the crime of housebreaking, the defendant did not "use" the gun, as the Legislature contemplated when it enacted section 36B(d); rather, we said, what he did constituted the lesser crime proscribed in section 36B(b), "wearing, carrying, or transporting any handgun."

\* \* \*

Our opinion in *Wynn* was filed September 1, 1988. The Drug Kingpin Act, of which section 281 A(b) is a part, *see* Ch. 287, Acts of Md.1989, was enacted May 19, 1989, effective July 1, 1989. Therefore, when it was passed, the Legislature knew, or, at least, is presumed to have known how we had defined "use." Possessed of that knowledge, the Legislature's proscription of "use" without any clear indication that it intended that a different meaning be given the term leads inevitably to the conclusion that it adopted the definition we had theretofore given it.

*Id.* at 147–50, 626 A.2d 946 (some internal citations omitted).

Further, the Court discussed the legislative history of the statute:

As we have indicated, section 281A was enacted in 1989 as part of the Drug Kingpin Act. Its purpose was "to reduce the supply of drugs in Maryland by establishing harsher penalties for drug dealers and by decreasing the profitability of participation in a drug trafficking crime." ...

As initially proposed, *see* S.B. 400 and H.B. 502, it was contemplated that section 281A(b) would punish anyone who "uses or possesses" a firearm during or in relation to a drug trafficking crime ...

\* \* \*

By deleting "possesses," and replacing it with "wears, carries, or transports," terms that, while less active than "use," are more active than "possesses", the Legislature clearly expressed an intention to require, for conviction, something more than the mere possession of a handgun during and in relation to a drug trafficking crime. Had the punishment of one who possesses a firearm during and in relation to a drug trafficking crime been the Legislature's goal, it would not have been necessary for it to delete that term.

*Id.* at 150–52, 626 A.2d 946 (internal citations omitted).

Thereafter, the Court considered the State's argument that case law interpreting 18 U.S.C. § 924(c)(1), which the Court recognized as "the federal counterpart to section 281A(b)," supported the defendant's conviction. *Id.* at 154, 626 A.2d 946. The Court rejected the view of "[t]he majority of federal courts"; those courts held that "a firearm is 'used,' for purposes of the statute, if possession is an integral part of the predicate offense or if the firearm is within easy reach and available to protect the user during the ongoing drug trafficking offense."[22] *Id.* (citations omitted). It reasoned, *id.* at 156–57, 626 A.2d 946 (citations omitted):

We stated earlier that section 281A(b), though similar in language to § 924(c)(1), contains language identical to section 36B, and "use" in that statute has been interpreted, by this Court, as requiring conduct different from possession—an active, rather than passive, employment of a handgun. That interpretation, of which the Legislature was aware when it enacted section 281A(b), conflicts with the way "use" has been interpreted by the majority of the federal courts construing § 924(c)(1). The interpretation given a federal statute ordinarily is persuasive in interpreting a state statute patterned upon the federal statute. In the

---

**22.** Congress later amended the federal statute to expressly "criminalize the 'possession' of a firearm 'in furtherance of' certain crimes." *Johnson, supra,* 154 Md.App. at 307, 839 A.2d 769.

case *sub judice*, not only is the authority interpreting the federal statute not uniform, but the legislative history of the state statute suggests that a different meaning of "uses" was intended, since the Legislature chose to use the same language in section 281A(b) as it had used in section 36B, knowing the gloss we had put on the latter. It follows that the General Assembly did not intend to equate "uses" with "possesses" as the majority of federal courts have done. This is particularly so where, as here, the Legislature amended the statute specifically to delete "possess" and replaced it with terms that are not, in all circumstances, its equivalent. We are obliged to follow the intent of the Legislature.

The State cites *Griffin v. State,* 137 Md.App. 575, 579–80, 769 A.2d 259 (2001); *Manigault v. State,* 61 Md.App. 271, 279, 486 A.2d 240 (1985); and *Pinkett v. State,* 30 Md.App. 458, 473, 352 A.2d 358, *cert. denied,* 278 Md. 730 (1976), to support its contention that the multiple sentences were lawful because, "[w]hen interpreting other statutes proscribing the possession of firearm [sic], this Court has determined that the unit of prosecution is the gun." We turn to review those cases.

In *Pinkett,* 30 Md.App. at 466 n. 10, 352 A.2d 358, the defendant was convicted of violating a former statute making it a crime to "wear, carry, or knowingly transport any handgun . . . in any vehicle traveling upon the public roads . . ." He had been charged with two violations of the statute for a single incident, which corresponded with two separate weapons—a revolver and a shotgun. *Id.* at 473, 352 A.2d 358. The Court looked to the statutory text in concluding that "the legislative intent was that a person wearing, carrying, or transporting more than one handgun is guilty of more than one crime." *Id.* In particular, the Court interpreted "the prohibition spelled out in the statute in the light of the legislative findings and declaration of policy . . . the penalties authorized . . . and the separate misdemeanor provisions." *Id.*[23]

---

**23.** Former Article 27, section 36B(a) provided:

Similarly, in *Manigault,* 61 Md.App. at 274, 486 A.2d 240, the defendant was convicted and sentenced separately for the possession of a single weapon used to perpetrate an assault upon two separate victims during "the course of a single criminal episode." The Court reversed one of the possession convictions, concluding that it was "an improper second conviction for the same, identical offense." *Id.* at 279, 486 A.2d 240. The Court reasoned, *id.:*

> A single criminal episode may, of course, give rise to a number of separate criminal charges, some of which may be multiplied but some of which may not. The key is to identify the unit of prosecution. Both an aggravated assault ... and a simple assault ... may properly be multiplied when there are multiple victims. The unit of prosecution is the victim. *With respect to the use of a handgun to perpetrate a crime of violence ..., the unit of prosecution is the crime of violence.* Assuming that the other elements have been proved, two victims imply two crimes of violence. That, in turn, implies two separate crimes of using a handgun to commit a crime of violence.
>
> With respect to the possession of a handgun ..., however, the unit of prosecution is the gun, not the victim. *Pinkett v. State,* 30 Md.App. 458 [352 A.2d 358] (1976). There was only one gun in this case and there was, therefore, only one crime of possessing a gun. A single assault committed with two guns could yield two possession convic-

---

"The General Assembly of Maryland hereby finds and declares that: (i) There has, in recent years, been an alarming increase in the number of violent crimes perpetrated in Maryland, and a high percentage of those crimes involve the use of handguns;

(ii) The result has been a substantial increase in the number of persons killed or injured which is traceable, in large part, to the carrying of handguns on the streets an d public ways by persons inclined to u se them in criminal activity;

(iii) The laws currently in force have not been effective in curbing the more frequent use of handguns in perpetrating crime; and

(iv) Further regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens."

*Pinkett,* 30 Md.App. at 473 n. 17, 352 A.2d 358.

tions, but even multiple assaults with a single gun may yield only one possession conviction . . .

(Emphasis added.) *See also Griffin,* 137 Md.App. at 580–81, 769 A.2d 259 (applying the rationale in *Manigault* to hold that a defendant who fired twice from the same weapon could not be convicted of and sentenced on two counts of possession of a firearm by a felon).

We consider persuasive the reasoning of the D.C. Circuit in *U.S. v. Anderson,* 59 F.3d 1323 (D.C.Cir.), *cert. denied,* 516 U.S. 999, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995) (subsequent history omitted). In that case, the defendant received four convictions under 18 U.S.C. § 924(c)(1), which were tied to a single "predicate offense" of conspiracy to distribute cocaine. *Id.* at 1324. In reversing three of the convictions,[24] the Court reasoned, *id.* at 1327–28:

[I]f Congress had for a moment contemplated—or intended the prospect—that a defendant would be charged, as was appellant, with four § 924(c)(1) violations appended to one underlying drug crime, we think it virtually inconceivable that Congress would have used the language of § 924(c)(1). It would have been all too easy to have written the words "each time" or "on each occasion" in the section to make that meaning clear . . .

\* \* \*

Section 924(c)(1) provides very serious penalties for repeated violations. The first conviction requires a five-year sentence, and the second and succeeding violations call for 20 years each. Under the government's interpretation, then, three or four "uses" or "carries" during one underlying drug crime or crime of violence would, as a practical matter, bring a life sentence. If Congress had intended

---

**24.** The court referred to multiple sentences *and* convictions in its analysis. Ultimately, it held "that only one § 924(c)(1) violation *may be charged* in relation to one predicate crime." *Id.* at 1334 (emphasis added). Other federal case law also discusses both multiple charges/convictions and sentences.

that result, we would of course honor the choice; but we think that if Congress had wished the statute to operate in that fashion, it would have used language making it obvious . . .

The court noted that the majority of its "sister circuits have determined that only one § 924(c)(1) violation can be appended to any single predicate crime." *Id.* at 1328. According to the court, the federal circuits so holding have "relied on two strands of analysis." *Id.* The first of those is that Congress's intent was to limit the statute's " 'unit of prosecution' to the underlying predicate offense." *Id.* The other rationale is that the statute is "ambiguous as to the appropriate unit of prosecution, and therefore the rule o f lenity" should apply. *Id. See also United States v. Lindsay,* 985 F.2d 666, 674 (2nd Cir.) (concluding "that congress considered the appropriate unit of prosecution to be the underlying drug-trafficking offense, not the separate firearms"), *cert. denied,* 510 U.S. 832, 114 S.Ct. 103, 126 L.Ed.2d 70 (1993)(subsequent history omitted); *United States v. Sims,* 975 F.2d 1225, 1236 (6th Cir.1992) (noting that the defendant could only be convicted and sentenced for one violation of the statute), *cert. denied,* 507 U.S. 932, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993)(subsequent history omitted); *United States v. Moore,* 958 F.2d 310, 314 (10th Cir.1992)(affirming that only one violation of the statute occurs, "despite the presence of multiple firearms"); *United States v. Hamilton,* 953 F.2d 1344, 1346 (11th Cir.) ("Use of more than one gun during a single drug trafficking offense will not support multiple counts under § 924(c)"), *cert. denied,* 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992) (subsequent history omitted); *United States v. Fontanilla,* 849 F.2d 1257, 1258 (9th Cir.1988)(noting that "section 924 sentences are linked to the underlying offenses"); *United States v. Privette,* 947 F.2d 1259, 1262 (5th Cir.1991) ("Multiple sentences under § 924(c) must be based upon the number of drug trafficking crimes in which firearms were used"), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992); *United States v. White,* 222 F.3d 363, 373 (7th Cir.2000)(affirming "that it was Congress's intent that the penalty imposed under § 924(c)

account for all of the guns used in a single underlying offense").[25]

We agree with appellant that the statute is ambiguous with respect to the unit of prosecution. The statutory text does not clearly indicate that the Legislature intended to subject a defendant to multiple sentences for multiple weapons in connection with a single offense of a "drug trafficking crime." Nor does the legislative history of the statute clearly reveal the legislative intent.[26] And, some of the gun cases discussed above are distinguishable because the underlying offense prohibited in the statutes at issue was the act of possessing a gun. In contrast, the predicate offense here is that of drug trafficking, and the possessory handgun offense is tied to that crime.

---

**25.** As noted, the Fourth and Eighth Circuits have rejected the view of the majority, holding that multiple consecutive sentences under the statute may be imposed. In *United States v. Lucas*, 932 F.2d 1210, 1223 (8th Cir.), *cert. denied*, 502 U.S. 869, 112 S.Ct. 199, 116 L.Ed.2d 159 (1991) (subsequent history omitted), the Eighth Circuit held that the defendant could be convicted of two separate "uses" of a firearm, arising from the same underlying drug offense. Similarly, in *United States v. Camps*, 32 F.3d 102, 109 (4th Cir.1994), *cert. denied*, 513 U.S. 1158, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995)(subsequent history omitted), the Fourth Circuit rejected the view of the majority of federal circuits, concluding: "Because there were three separate uses and/or carryings of the weapons, Camps properly received five years for the first use, twenty years consecutive for the second, and twenty years consecutive for the third." In that case, however, the court noted that "[e]ach of the illegal acts for which Camps received a separate sentence was consummated before the next one was initiated[.]" *Id.*

**26.** The State refers to the Briefing Document and Synopsis by Governor William Donald Schaefer for Senate Bill 400/House Bill 502, the bills that introduced the Drug Kingpin Act:

There has been a dramatic increase in the number of drug related homicides, especially among innocent victims. Current law does not make the mere possession of a handgun for possible future use illegal. This component would alter that situation. It provides for the following:

— It makes the use or possession of any firearm during and in relationship to a drug trafficking crime a separate felony offense.

— It provides for a mandatory minimum sentence of 5 years and a maximum sentence of up to 20 years. The mandatory minimum sentence is doubled if the firearm is a machine gun or if the firearm is equipped with a silencer or amplifier.

Therefore, we shall adopt the position espoused by the majority of federal circuits interpreting § 924(c)(1). Like its federal counterpart, C.L. § 5–621 provides very serious penalties. But, if the Legislature had intended multiple sentences for each weapon involved in a single drug trafficking offense, it could have explicitly so stated. Applying the rule of lenity, we hold that the unit of prosecution under C.L. § 5–621 is the drug offense, rather than the gun. Accordingly, we shall reverse three of appellant's convictions and sentences under C.L. § 5–621.

JUDGMENTS OF CONVICTION AND SENTENCES REVERSED FOR THREE COUNTS OF POSSESSION OF A FIREARM IN RELATION TO DRUG TRAFFICKING (COUNTS 11, 12, 13). ALL OTHER CONVICTIONS AND SENTENCES AFFIRMED. COSTS TO BE PAID 50% BY APPELLANT, 50% BY WICOMICO COUNTY.